CIVILLA J. BRUBAKER, TRANSFEREE OF ASSETS OF JOLIET PROPERTIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57621. Filed September 30, 1957.

*Sydney O. Simon, Esq.,* for the petitioner.
*Paul Levin, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined transferee liability against the petitioner for deficiencies in tax of Joliet Properties, Inc., as follows: A deficiency in declared value excess-profits tax for the taxable year ended January 31, 1946, in the amount of $1,196.96, and deficiencies in income tax for the taxable years ended January 31, 1947 and 1948, in the respective amounts of $7,090.37 and $2,213.80.

The petitioner has conceded that she is the transferee of assets of the corporation and that in the event of a finding of additional tax liability she is liable therefor as transferee. An issue as to depreciation raised by the pleadings has been conceded by the petitioner. The only issue remaining for consideration relates to a bad debt deduction in the amount of $37,967.68 claimed by the corporation for the taxable year ended January 31, 1947. The taxable years ended January 31, 1946 and 1948, are not involved except insofar as the petitioner contends that they may be affected by a carryback or carryover of a net operating loss for 1947, which depends upon the bad debt deduction issue.

### FINDINGS OF FACT.

The petitioner is an individual residing in Wheaton, Illinois. Joliet Properties, Inc., the transferor corporation, filed its income and declared value excess-profits tax return for the taxable year ended January 31, 1946, and its income tax returns for the taxable years ended January 31, 1947 and 1948, with the collector of internal revenue for the first district of Illinois. The petitioner's husband, Henry J. Brubaker, will hereinafter sometimes be referred to as Brubaker.

Henry J. Brubaker and Kenneth F. Nash first became associated in business in July 1944, and thereafter were associated with others in organizing and operating various business enterprises. In 1946 the enterprises in which they had interests were Joliet Properties, Inc., Crest Chemicals, Inc., Joliet Chemicals, Ltd., Joliet Industrials, Inc., and Desplaines Oil Company.

Joliet Properties, Inc., was incorporated in Illinois in January 1945. The business of the corporation consisted of renting buildings

which it owned to various commercial tenants. In October and November 1946, Brubaker (and the petitioner), J. H. Lahman, and Nash owned all the stock, as follows: Brubaker and his wife (the petitioner), 3,333 shares; J. H. Lahman, 3,333 shares; and Nash, 3,334 shares. As officer or director or both, Brubaker was active in the management and control of the company until its dissolution in 1950. Among his duties was that of obtaining tenants for the buildings and negotiating the lease arrangements.

In October and November 1946, Nash was indebted to Joliet Properties, Inc., on obligations amounting to $65,467.68, consisting of $2,-178.66 on open account for unexpended funds advanced by the corporation to him as trustee for the purchase of certain properties for the corporation; $1,354.33 on a note issued on or before January 31, 1946, for the unpaid balance of the purchase price of certain Florida real estate; $16,154.90 on a note given on or before January 31, 1946, toward the purchase of certain Florida real estate; $28,500 on a note given by him to the corporation for the interest of the corporation in the limited partnership called Joliet Chemicals, Ltd.; and $17,-279.79 on a note of both Nash and his wife, secured by a mortgage on certain real estate in Miami Beach, Florida.

Brubaker and others associated with Nash in business were dissatisfied with his business methods and practices. They believed that he was seeking to further his own financial ends at the expense of his partners and associates. They also disliked his personal activities, such as betting on horseraces. Their business relations with Nash which had previously been amicable deteriorated to such a point that it was finally deemed necessary to sever all business relations with him. The immediate, precipitating factor in this final determination was a transaction involving a sale of realty by Joliet Properties, Inc., to another through Nash for $20,000, of which only $4,000 was remitted by Nash to the corporation.

On October 7, 1946, Nash bought all the then outstanding interests in the limited partnership, Joliet Chemicals, Ltd., for $108,000. Apparently he had previously acquired the interest of Joliet Properties, Inc., in that partnership for $28,500, for which he had given the note referred to hereinabove. The partnership was dissolved and Nash thus acquired all the assets of the partnership, including the assets of Crest Chemicals, Inc., the stock of which had been owned by the partnership. To raise money to pay the $108,000 for the partnership interest, Nash borrowed $55,000 from one Hansen, giving a chattel mortgage on the assets of the partnership, and borrowed $50,000 or more from a chemical company, also giving a mortgage to secure that indebtedness. On October 7, Nash also sold his residence to Hansen for an undisclosed amount.

On November 26, 1946, Brubaker entered into an agreement with Lahman, referred to therein as an option, to purchase Lahman's stock in Joliet Properties, Inc., and Midwest Chemical Company (name changed to Desplaines Oil Company) for $20,000. Brubaker made a downpayment of $5,000 on November 26 and completed payment on December 6, 1946, at which time he received a bill of sale for the stock in the two corporations.

On November 25, Brubaker entered into an agreement with Nash to acquire Nash's stock in Joliet Properties, Inc., and Midwest Chemical Company. The contract provides as follows:

> Mr. Nash, as sole owner of all of the assets of what was formerly Joliet Chemicals, Ltd., will assign a claim of Joliet Chemicals, Ltd. [against Desplaines Oil Company] in the amount of $22,476.26 to Joliet Properties, Inc.
>
> He will assign his 250 shares of stock in Desplaines Oil Company, a Corporation, formerly Midwest Chemical Company, to Mr. Brubaker.
>
> He will also assign his 3334 shares of stock in Joliet Properties, Inc. to Mr. Brubaker.
>
> In consideration of the foregoing, Mr. Brubaker will cause to be returned and cancelled to Mr. Nash all of the obligations of Mr. Nash and Wanda C. Nash, his wife, to Joliet Properties, Inc., consisting of open account of $2178.66; note for $1354.33; note for $16,154.90; note secured by mortgage for $17,279.79; and cancellation of obligation of Mr. Nash to Joliet Properties, Inc., in connection with the recent sale by Joliet Properties, Inc. to Mr. Nash, at $28,500.00 of certain interests which Joliet Properties, Inc. acquired prior hereto in Joliet Chemicals, Ltd.; and will also pay Mr. Nash in cash the sum of $10,000.00.
>
> Mr. Nash acknowledges receipt of $5,000.00 to apply on said cash payment.

At a meeting of the board of directors of Joliet Properties, Inc., on November 26, 1946, Brubaker, who had been secretary, became president. The minutes recite as follows:

> The President then reported that he had completed arrangements which he considers advantageous to the company, whereby he has purchased from Kenneth F. Nash, 3334 shares of the capital stock of this corporation.
>
> The President further stated that in order to compensate Kenneth F. Nash for said stock, he had made an agreement with Kenneth F. Nash that, in consideration of the foregoing, he would cause to be surrendered and delivered to Kenneth F. Nash a receipt in full for $2,178.66 due on open account from Kenneth F. Nash to this company; he had agreed to surrender and mark paid a note of $1,354.33 owing by Kenneth F. Nash to this company; he had agreed to surrender to Kenneth F. Nash a note for $16,154.90 owing by Kenneth F. Nash to this company; and that he had agreed to procure a receipt in full by this company to Kenneth F. Nash, evidencing payment by Kenneth F. Nash of his obligation to the company (represented by a promissory note or agreement to pay the sum of Twenty-eight Thousand, Five Hundred Dollars ($28,500.) heretofore given by Kenneth F. Nash in connection with the purchase by him from this company of certain interests * * * in Joliet Chemicals, Ltd., a limited partnership. He also had agreed to cause the indebtedness of Kenneth F. Nash to this company in the amount of $17,279.79, evidenced by the note of Kenneth F. Nash and Wanda C. Nash, his wife, secured by certain real estate on Regatta Avenue in Miami Beach, Florida, to be surrendered to said Kenneth F. Nash.

All of the above claims, notes and obligations owing by Kenneth F. Nash amount to the sum of Sixty-Five Thousand, Four Hundred Sixty-Seven Dollars and Sixty-Eight Cents ($65,467.68).

The President further stated that, notwithstanding the total amount of indebtedness of Kenneth F. Nash as aforesaid, he did not feel that said obligations could be collected in the full amount thereof, and suggested that he would be willing to purchase from the company all of said obligations in order to complete his transaction with Kenneth F. Nash for the sum of Twenty-seven Thousand, Five Hundred Dollars ($27,500.) in cash.

Edgar S. Foutz presented the following resolution:

BE IT RESOLVED THAT Mr. Brubaker's offer to purchase from this company all of the said obligations of Mr. Nash for the sum of Twenty-seven Thousand Five Hundred Dollars ($27,500.00) in cash be accepted, and that the President and Secretary be and they are hereby authorized to execute all instruments necessary to release and discharge said Kenneth F. Nash of and from all of the foregoing claims and demands in said amounts, and with the further understanding that all accrued interest on said obligations is waived by the company.

A three-way exchange of checks was involved in consummating the deal on January 2, 1947. Joliet Properties, Inc., was indebted to Desplaines Oil Company (formerly Midwest Chemical Company) for a loan in the amount of $45,000. Joliet Chemicals, Ltd., the former limited partnership whose assets were then owned by Nash, had a claim against Desplaines Oil Company for $22,476.26. Under the agreement of November 25 between Brubaker and Nash, Nash was to assign to Joliet Properties the claim of Joliet Chemicals against Desplaines Oil in the amount of $22,476.26. On January 2, 1947, Joliet Properties issued a check for $22,450 to Desplaines Oil Company which was deposited, thus reducing the $45,000 indebtedness to $22,550, which was written off some years later. On the same date Desplaines Oil Company, sub nom. Midwest Chemical Company, in turn drew a check in favor of Brubaker for $22,476.26 which was deposited in the personal bank account of "H. J. or Civilla J. Brubaker." On the same date Brubaker drew a check in favor of Joliet Properties for $22,475, which was reflected on the books and records of Joliet Properties, Inc., as a credit to the notes receivable account due from Nash, and as a debit to cash. In accordance with his agreement with Nash, Brubaker paid Nash $10,000. In carrying out the deal Brubaker and Joliet Properties agreed to reduce the amount of back salary owing to Brubaker by an amount of $5,025. This amount was credited to the notes or accounts receivable from Nash and debited to accounts payable to Brubaker. This adjustment, plus Brubaker's check for $22,475 aggregated the amount of $27,500 for which Brubaker was to purchase the claims of the corporation against Nash totaling $65,467.68. The amount of $37,967.68, representing the difference between Nash's original indebtedness and the $27,500 paid by Brubaker to Joliet Properties, Inc., was written off by the corpora-

tion as a bad debt as of the close of the taxable year ended January 31, 1947.

As a result of these transactions Brubaker and his wife, the petitioner, owned all the stock of both Joliet Properties, Inc., and Desplaines Oil Company.

In its return for the taxable year ended January 31, 1947, Joliet Properties, Inc., claimed a deduction, as a bad debt, in the amount of $37,967.68. Such return does not show the receipt of any gain upon the sale or exchange of capital assets. The respondent, in determining the deficiency for that year, disallowed the claimed deduction, upon the ground that the amount represented a loss upon the sale or exchange of capital assets, which was nondeductible because there were no capital gains (section 117 (d) (1), I. R. C. 1939) and alternatively because the sale or exchange was to a stockholder owning more than 50 per cent of the outstanding stock (section 24 (b) (1) (B)), and upon the further alternative ground that the debts did not become worthless during the taxable year ended January 31, 1947.

*Ultimate Findings of Fact.*

The claims of Joliet Properties, Inc., against Nash, totaling $65,467.68, were not compromised or settled by that corporation with Nash, but such claims were sold by that corporation to Brubaker for $27,500.

OPINION.

It is the petitioner's position that her husband, Henry J. Brubaker, acted on behalf of Joliet Properties, Inc., and effected a compromise or settlement of Nash's indebtedness to it, and that accordingly that corporation is entitled to deduct the uncollected balance of $37,967.68 as a bad debt under section 23 (k) (1).[1]

The respondent, on the other hand, contends that Brubaker was negotiating in his individual capacity with Nash for the purchase of Nash's stock of Joliet Properties, Inc., and Nash's stock of Desplaines Oil Company, and that in connection therewith he purchased from Joliet Properties, Inc., all of Nash's obligations for the sum of $27,500. He states that such loss was a loss on the sale of capital assets, that the corporation had no capital gains during that year and that the sale was effected with a stockholder owning more than 50 per cent of the outstanding stock.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(k) BAD DEBTS.—

(1) GENERAL RULE.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *

It is, therefore, his position that the claimed loss on the sale of capital assets is not deductible in view of the provisions of sections 23 (g) (1), 117 (d) (1), and 24 (b) (1) (B).[2] The respondent argues, alternatively, that if the transaction be considered as a compromise of the indebtedness by Brubaker on behalf of the corporation, the corporation is not entitled to a bad debt deduction since there has been no showing that the obligations became worthless during the taxable year ended January 31, 1947.

From a careful consideration of the testimony it seems clear to us that Brubaker's real purpose was to sever all business connections with Nash. Quite apparently it was also his desire to acquire complete ownership of Joliet Properties, Inc., and Desplaines Oil Company. The evidence shows that the petitioner did sever his relations with Nash by selling his interest in the partnership Joliet Chemicals, Ltd., and by buying Nash's interest in both Joliet Properties and Desplaines Oil. Brubaker also acquired all of Lahman's interest in those two corporations. Throughout his testimony Brubaker repeatedly referred to his desire to sever relations with Nash. He stated that he was seeking "feverishly to sever all business ties" and that "[w]e were desperately concerned about getting untangled from Nash, getting his stock,—getting him out of Joliet Properties."

The contract of November 25, 1946, was between Brubaker individually and Nash and clearly was a contract for the purchase of Nash's stock in Joliet Properties and Desplaines Oil Company. The consideration passing from Brubaker was $10,000 in cash and an undertaking to cause to be returned to Nash and canceled all of the obligations to Joliet Properties of Nash and his wife. The minutes of a meeting of the board of directors of Joliet Properties, Inc., show that Brubaker offered to purchase from Joliet Properties, Inc., all of such obligations for $27,500 in order to complete his transaction with Nash and that Brubaker's offer to purchase these claims was accepted. The minutes of the meeting contain nothing which would warrant a conclusion that Brubaker was acting as agent for the corporation,

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

(g) CAPITAL LOSSES.—

(1) LIMITATIONS.—Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117.

SEC. 117. CAPITAL GAINS AND LOSSES.

(d) LIMITATION ON CAPITAL LOSSES.—

(1) CORPORATIONS.—In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges.

SEC. 24. ITEMS NOT DEDUCTIBLE.

(b) LOSSES FROM SALES OR EXCHANGES OF PROPERTY.—

(1) LOSSES DISALLOWED.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual ;

either in acquiring the stock or in relieving Nash of his obligations to the corporation. It is true that in the contract between Brubaker and Nash, Nash undertook to transfer to Joliet Properties a certain claim for $22,476.26, but as the transaction was carried out a check in that amount was drawn by Desplaines Oil Company in favor of Brubaker, who deposited it in his personal bank account. Brubaker then paid over to Joliet Properties by his personal check an amount of $22,475 which, together with the amount of $5,025 of back salary due Brubaker which was canceled by the corporation, made up the full amount of $27,500 which Brubaker had agreed to pay the corporation, as purchase price, for all of the claims of the corporation against Nash and his wife.

Upon the evidence before us we cannot conclude that this was an arm's-length compromise of the claims against Nash through Brubaker. The record contains no evidence of any specific attempts by the corporation to collect the indebtedness from Nash or that he had even been called upon for payment, except as to a $16,000 item representing part of the selling price of certain land. The evidence shows that a part of the indebtedness, $17,279.79, was represented by a note of Nash and his wife which was secured by a mortgage on real estate in Miami Beach, Florida, but there is no explanation why this particular note should have been compromised. The evidence does not establish that Nash was insolvent at that time. No financial statements were submitted and Brubaker testified that he did not know what Nash had in his bank account and that he did not know his precise financial status. The testimony of both Brubaker and Erickson, who was the comptroller of Joliet Properties and of other corporations in which Nash and Brubaker were interested, regarding Nash's financial condition was very general. In substance, they testified that it was difficult for Nash to get credit and that they would not have wanted to purchase claims against him because of fear of uncollectibility. However, Erickson conceded that he did not know Nash's net worth. Evidence was adduced that on July 29, 1947, Nash confessed liability for a judgment in the Circuit Court of Cook County in the amount of $12,000 and that on March 14, 1955, a notice of Federal tax lien was filed against Nash for income taxes and interest for the years 1944 to 1947, inclusive, in the total amount of $190,066.22. However, there was no evidence presented as to the extent of his assets. We think the evidence falls far short of showing that Nash was insolvent at the time in question. Indeed, if he owed such a large amount of income taxes it would indicate that through the years 1944 to 1947 he had large amounts of income.

Upon a consideration of the whole record we have concluded and have found as a fact that the claims totaling $65,467.68 held by Joliet

Properties were not compromised by the corporation with the debtor but that such claims were sold by the corporation to Brubaker. Such claims constituted capital assets in the hands of the corporation. *Graham Mill & Elevator Co.* v. *Thomas*, (C. A. 5, 1945) 152 F. 2d 564; *Rockford Varnish Co.*, 9 T. C. 171; sec. 117 (a) (1), I. R. C. 1939. Accordingly, the losses sustained by the corporation constituted capital losses, the deduction of which, in the absence of capital gains, is precluded by section 117 (d) (1), *supra.*

Even if the transactions here involved were considered as amounting to a compromise by Joliet Properties, through Brubaker, of its claims against Nash, we think, for the reasons set forth above, that the petitioner could not prevail on the contention that the corporation is entitled to a bad debt deduction in the amount of $37,967.68 since she has not met her burden of showing that Nash was insolvent and that his debt in the amount of $37,967.68 became worthless in the taxable year. It has been held that a valid debt is not ascertained to be worthless where the creditor, for consideration satisfactory to himself, voluntarily releases a solvent debtor from liability. See *American Felt Co.* v. *Burnet*, (C. A., D. C., 1932) 58 F. 2d 530, affirming 18 B. T. A. 504; *George F. Thompson*, 6 T. C. 285, affirmed per curiam (C. A. 2, 1947) 161 F. 2d 185; *Northwest Equipment Co.*, 34 B. T. A. 371; *O'Bryan Brothers, Inc.*, 42 B. T. A. 18, affd. (C. A. 6, 1942) 127 F. 2d 645, certiorari denied 317 U. S. 647.

*Decision will be entered under Rule 50.*