T.C. Summary Opinion 2012-99

UNITED STATES TAX COURT

GUILLERMO JAVIER ARGUELLO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8821-10S.                    Filed October 10, 2012.

Guillermo Javier Arguello, pro se.

<u>Karen J. Lapekas</u>, for respondent.

SUMMARY OPINION

CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant to the

provisions of section 7463.[1]  Pursuant to section 7463(b), the decision to be entered

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, in effect for the relevant period.  Rule references are to the Tax Court Rules of Practice and Procedure.

is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

In a notice of deficiency dated March 8, 2010 (notice), respondent determined a $4,750 deficiency in petitioner's 2007 Federal income tax. The issue for decision is whether petitioner is entitled to a $19,000 business bad debt deduction claimed on a Schedule C, Profit or Loss From Business, included with his 2007 Federal income tax return.

## Background

Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Florida.

At all times relevant petitioner was employed by Guggenheim Investments. Not much is known about that company except that it was owned by an individual identified in the record only by surname--Mr. Guggenheim. Mr. Guggenheim also owned various other companies or businesses (Guggenheim companies). Although formally an employee of Guggenheim Investments, petitioner provided services to other of the Guggenheim companies as well. The record is less than clear regarding the extent to which the Guggenheim companies transacted any business between or among themselves.

Netrostar, Inc. (Netrostar), a corporation organized by Marcin Ladowski before the year in issue, offered Internet Web site design services to its customers. During 2005 petitioner, Mr. Guggenheim, and Mr. Ladowski, then the sole shareholder of Netrostar, met to discuss a business arrangement among themselves, one or more of the Guggenheim companies, and Netrostar. Apparently, at that time Netrostar was in need of financing and customer/client referrals. Mr. Guggenheim and petitioner agreed to provide financing, share customer lists, and contribute management services to Netrostar. In return, Mr. Guggenheim and petitioner each were to receive a one-third ownership interest in Netrostar (agreement), although neither was issued any shares of Netrostar's stock. The agreement was not reduced to writing. Petitioner characterized the agreement as a "a gentleman's agreement", evidenced only by "a handshake". The agreement was intended to be symbiotic--Netrostar would receive needed financing, business referrals, and management assistance and the Guggenheim companies could take advantage of the Web site design services Netrostar offered.

As it turned out, towards the end of 2007 one of the Guggenheim companies was not doing well, and Mr. Guggenheim focused his attention and apparently his financial resources on that company, which, to some extent, frustrated the goal of the agreement.

As best we can determine from what has been submitted, Mr. Ladowski was Netrostar's only employee during 2007, although petitioner did provide some accounting or bookkeeping services to that company. The Guggenheim companies and/or their customers did not generate the income that Netrostar expected to receive from those sources. Furthermore, according to petitioner, because Mr. Guggenheim began "pouring all of his money" into one of the other Guggenheim companies, Guggenheim Investments and Netrostar were unable to satisfy payroll obligations and other accounts payable.

During this time Mr. Ladowski's salary from Netrostar was modest, and taking into account the financial demands of his family, he was unable to afford a car that he needed in order to keep Netrostar in business. Netrostar's financial status did not allow Mr. Ladowski's modest salary to be increased. According to petitioner, Mr. Guggenheim wanted Netrostar to continue operations, presumably to fill the needs of some of his companies. Petitioner devised a plan that would provide Mr. Ladowski with the car that he needed to keep Netrostar in business and in turn, further the interests of Mr. Guggenheim.

In September 2007 petitioner purchased a 1991 Alfa Romeo (Alfa) that was in need of major repairs. The cost of the car, repairs, and reconditioning, all of which, according to petitioner, were paid through charges to one of his credit cards,

totaled $24,000. At some point before the close of the year, petitioner "sold" the Alfa to Mr. Ladowski, who used it for business and personal purposes. It is unclear in whose name the car was titled.

In order to "pay" petitioner for the Alfa, Mr. Ladowski, as Netrostar's "Director", signed a promissory note dated September 22, 2007 (note). The terms of the note obligated Mr. Ladowski or Netrostar (we are not sure which)[2] to pay $24,000 to petitioner in installments of $1,000 on the first day of each month, for twenty four months, commencing on September 1, 2007.[3] By the end of 2007 payments made pursuant to the note, plus a payment made to petitioner in connection with an apparent modification of the terms of the note as more fully discussed below, reduced the outstanding principal owed on the note to $19,000.

The debt evidenced by the note was not the only form of financing that petitioner provided to Mr. Ladowski or Netrostar. Petitioner was also liable as a cosigner on a Visa credit card account with a balance of $33,000 as of the close of

---

[2]Although the note references Netrostar as the debtor, petitioner's testimony suggests that he considered Mr. Ladowski to be the debtor. We will follow the paper and treat Netrostar as the debtor.

[3]The note is dated September 22, 2007, which hardly allows for the payments to "commence" on September 1, 2007. Furthermore, the note provides for interest, but the repayment schedule does not take the accrual of interest into account. These discrepancies are unexplained.

2007. That credit card account was used to pay Netrostar expenses. Petitioner was also a cosigner on two American Express credit card accounts used to pay expenses related to one or more of the Guggenheim companies (credit card accounts). In December 2007 petitioner agreed to relieve Netrostar of its obligation for the balance due on the note, which at the time was $21,000, in exchange for: (1) an additional $2,000 payment to be made before the end of the year; and (2) Mr. Guggenheim's agreement to assume petitioner's obligations incurred as a cosigner on the credit card accounts.

Petitioner's 2007 Federal income tax return includes a Schedule C that shows petitioner as the proprietor of a business described as a "Financing Company". At trial petitioner admitted that during 2007 he was not in the trade or business of lending money.

Petitioner claimed a $19,000 bad debt deduction on the Schedule C. The deduction relates to the outstanding balance on the note as of the close of 2007. Because no income is reported and no other deductions are claimed on the Schedule C, the bad debt deduction resulted in a $19,000 net operating loss that is taken into account in the adjusted gross income reported on petitioner's 2007 return.

The bad debt deduction is disallowed in the notice. According to the notice, the bad debt deduction is not allowable because petitioner "did not establish that the business expense shown on * * * [his] return was paid or incurred during the taxable year and that [the] expense was ordinary and necessary to * * * [his] business."[4]

## Discussion

According to petitioner the debt to which the bad debt deduction relates was incurred in order to enhance his relationship with Mr. Guggenheim and/or his employment with Guggenheim Investments. As petitioner views the matter: (1) the debt was incurred in pursuit of his trade or business as an employee of Guggenheim Investments; (2) the debt was worthless as of the close of 2007; and (3) he is entitled to the bad debt deduction claimed on his return. According to respondent: (1) neither the note nor the Alfa purchase gave rise to a bona fide debt between Netrostar and petitioner; but if one of them did (2) the debt was not worthless as of the close of 2007; and even if it was (3) the debt is properly treated as a nonbusiness bad debt and not as a business bad debt.

---

[4]We are not sure how respondent expected petitioner to establish that the "expense" giving rise to the bad debt deduction could have been "paid", but we get the point.

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deductions claimed.[5] Rule 142(a); see also INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84, (1992); Deputy v. du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

A taxpayer is entitled to a deduction for a debt, business or nonbusiness, that becomes wholly or partially worthless during the taxable year. See sec. 166. Only a bona fide debt qualifies for the bad debt deduction. Sec. 1.166-1(c), Income Tax Regs. The distinction between a business bad debt and a nonbusiness bad debt is important because business bad debts offset income dollar-for-dollar, see sec. 166(a), (d)(1)(A), while a nonbusiness bad debt is treated as a loss arising from the sale or exchange of a capital asset held for not more than one year, see sec. 166(d)(1); sec. 1.166-5(a)(2), Income Tax Regs. We need not concern ourselves with the distinction here, however, because for the following reasons we find that petitioner has failed to establish that any debt evidenced by the note or otherwise was "worthless" within the meaning of section 166 as of the close of 2007.

---

[5]Petitioner does not claim that the provisions of sec. 7491(a) are applicable, and we proceed as though they are not.

There is no standard test for determining worthlessness; whether and when a debt becomes worthless depends on all the facts and circumstances. Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). In general, the year of worthlessness must be established by identifiable events constituting reasonable grounds for abandoning any hope of recovery. See Crown v. Commissioner, 77 T.C. 582, 598 (1981). A creditor's determination that there is no hope of recovery of a debt due and owing must be made in the exercise of sound business judgment and based upon information that is as complete as is reasonably obtainable regarding the debtor's financial condition or ability to satisfy the debt. See Andrew v. Commissioner, 54 T.C. 239, 248 (1970).

We assume, without finding, that the Alfa purchase and the resultant note created a bona fide debt owed to petitioner by Netrostar. We cannot assume, and do not find, that as of the close of 2007, Netrostar's financial condition, although shaky, prompted petitioner to relinquish his rights to collect the balance on the note. The evidence shows, and we find, that the debt was extinguished not so much on account of Netrostar's ability or inability to pay, but rather pursuant to an arrangement that allowed petitioner to avoid potential liabilities in connection with the credit card accounts. See Brubaker v. Commissioner, 28 T.C. 1281, 1288 (1957). A "debt is not * * * worthless where the creditor for considerations

satisfactory to himself voluntarily releases a solvent debtor from liability." Am. Felt Co. v. Burnet, 58 F.2d 530, 532 (D.C. Cir. 1932), aff'g 18 B.T.A. 504 (1929). That is what happened here. Accordingly, we find that petitioner has failed to establish that the debt to which the deduction here in dispute relates was, as of the close of 2007, wholly or partially "worthless" within the meaning of section 166 and further find that he is not entitled to the bad debt deduction here in dispute.

To reflect the foregoing,

Decision will be entered

for respondent.