GIFFIN ANDREW AND PAULINE ANDREW, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2725–68. Filed February 11, 1970.

*Fremont Meyers*, for the petitioners.
*Roy S. Fischbeck*, for the respondent.

OPINION

Respondent concedes that petitioners expended $18,500 in 1965, all of which was lost in the operation of the livestock auction barn. The question is whether the losses fall within the confines of section 166, thus entitling petitioners to treat the $8,500 advanced to Boyd as a loss from a worthless nonbusiness debt and to treat the $10,000 expended to liquidate the amounts due customers of the barn as a worthless business debt or, alternatively, as a loss from a worthless nonbusiness debt.

First, as to the $8,500, section 166(a) allows as a deduction "any debt which becomes worthless within the taxable year." The loss from a worthless "nonbusiness debt," however, is not deductible under section 166(a), but is considered under section 166(d) as a loss from the sale or exchange of a capital asset held for not more than 6 months. A "nonbusiness debt" is defined, in general terms, as a debt other than a debt created or acquired in connection with a trade or business of the taxpayer or a debt the loss from the worthlessness of which is incurred in the taxpayer's business. Sec. 166(d)(2).

To qualify for a deduction for a worthless debt a taxpayer must show that he and his alleged debtor intended to create a debtor-

creditor relationship, that a genuine debt in fact existed, and that the debt became worthless within the tax year. Sec. 1.166–1(c), Income Tax Regs.; *Evans Clark*, 18 T.C. 780, 783 (1952), affirmed per curiam 205 F. 2d 353 (C.A. 2, 1953); *Estate of Carr V. Van Anda*, 12 T.C. 1158, 1162 (1949), affirmed per curiam 192 F. 2d 391 (C.A. 2, 1951). Intrafamily transactions are subject to special scrutiny. The taxpayer must show that there existed at the time of the transaction a real expectation of repayment and an intent to enforce collection of the indebtedness. *Id.*

Respondent challenges petitioners' claim to a loss from a worthless nonbusiness debt for the $8,500 advanced to Boyd on the grounds that (1) the parties did not intend to create a debtor-creditor relationship; (2) the obligation to repay the advances was not unconditional but was contingent; and (3) the debt, if one existed, was not shown to have become worthless in 1965. We disagree.

The record does not reveal any indication that a gift was either intended by petitioners or imagined by Boyd. To the contrary, the notations on the three checks comprising the advances that they were loans, coupled with the undisputed, credible testimony that the parties agreed that repayment would be made within 90 days, show the requisite intent to establish a debtor-creditor relationship. Furthermore, we do not interpret the testimony as showing only a contingent obligation to repay—an obligation dependent on the financial success of the livestock auction business. Instead, a fairer interpretation of the testimony is that Boyd expected to be able to repay the loans from income derived from the livestock auction business— this was his only source of income at that time—not that he was obligated to make repayments only from that source.

Nor does the evidence fail to show that petitioners' debt claim against Boyd became worthless in 1965. After liquidating his heavily mortgaged livestock farming operation on December 20, 1965, Boyd had only $300 to $400 remaining. His only other property was a 1965 Chevrolet automobile, on which he owed $1,500, and his household furniture. Thus his only substantial asset was his earning power, and he had no special skills. He had accepted a job in Kansas City as a laborer, receiving $3.25 per hour or about $120 per week, and had to pay the cost of moving his family, consisting of his wife and three children, and of supporting them in the new location. He had no other source of income.

At that time the debt of $8,500 had no commercial value and could not have been collected even if petitioner had forced Boyd into bankruptcy. The expected source of repayment, the auction business, had terminated in failure, and his farming venture had been liquidated, leaving a negligible surplus. Although petitioner made no formal

demands for repayment of the loans, he testified that he had kept fully informed of Boyd's financial condition and that he could not have collected the debt even if Boyd had "sold his clothes." While failure to demand payment is significant in some circumstances, it is not important here, where the debtor was completely insolvent: the law does not require a taxpayer "to do a useless act." *Kate Baker Sherman*, 18 T.C. 746, 752 (1952) ; cf. sec. 1.166–2(b), Income Tax Regs. The $8,500 is allowable under section 166(d) as a loss from a nonbusiness debt.

Petitioners contend that the $10,000 advance is deductible by reason of section 166(f).[2] That section provides worthless business debt treatment for a loss attributable to certain payments by a guarantor, endorser, or indemnitor. Respondent argues initially that section 166(f) does not apply to petitioners' payment of the $10,000. He points out that petitioners' obligation ran only to the surety; that no claim by the surety ever actually arose; and, consequently, that petitioners' payment was made voluntarily rather than as a "guarantor, endorser, or indemnitor."

Respondent's argument requires a decision as to the bounds of section 166(f). The surety executed a General Live Stock Bond guaranteeing Boyd's obligation to account for and pay the proceeds of livestock sales. Petitioners and Boyd simultaneously executed the general indemnity agreement, obligating themselves to indemnify the surety against "any and all demands, liability, loss, costs, damage or expense of whatever nature or kind, including counsel fees," which might be incurred under the bond.

On learning that Boyd and Jerry had depleted their custodial account and owed $10,000 to $12,000 to various customers, including Mc-Cleave, petitioners had two alternatives: (1) To wait and allow the surety to replenish the account and then, when called upon to do so, to indemnify the surety for its payments, or (2) immediately to pay off the customers' claims directly, thereby limiting their losses by avoiding the necessity of reimbursing the surety for all its expenses and costs, including counsel fees. Assuming the worthlessness of the customers' claims against Boyd and Jerry, respondent does not argue that section 166(f) would not apply had petitioners followed the former course, but contends that by pursuing the latter course, peti-

---

[2] SEC. 166. BAD DEBTS.

(f) GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS.—A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) [nonbusiness debts] shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.

tioners do not come within the section because they had no legal obligation to pay anyone until the surety first paid the customers.

We think respondent reads section 166(f) too narrowly. Petitioners were satisfied, and the evidence confirms, that they would have been required to make good on their indemnity. Although in form petitioners' obligation ran to the surety, as long as petitioners were solvent the surety essentially had no liability and was only a conduit. To be sure, the surety executed the General Live Stock Bond, a requirement imposed by State law. Mo. Ann. Stat. sec. 277.080 (1963). But, because of petitioners' agreement to indemnify the surety for all payments it may make under the bond, petitioners, not the surety, were the real guarantors of Boyd's obligation to his customers. By paying the customers directly, they merely telescoped the transaction, and thereby avoided additional expenditures ("all demands, liability," etc.) that would have arisen had the surety first been called upon to liquidate the customers' claims. In a variety of other situations the tax laws frequently telescope business transactions—thus eliminating intermediate steps which have no economic significance—in order to reflect their true substance. We find nothing in section 166(f) limiting its benefits only to those situations in which the charade is played to the end. A taxpayer is not required "to throw good money after bad" or await "the judgment of a court" in order to cause a "sheriff to demonstrate a fact he already knows." *Thom* v. *Burnet*, 55 F. 2d 1039, 1040 (C.A.D.C. 1932).

Respondent's argument would have greater weight if the deduction under section 166(f) depended upon the creation of a disembodied, already worthless, debt through subrogation or contribution or some similar doctrine. Cf. *Putnam* v. *Commissioner*, 352 U.S. 82 (1956). It does not. The section concerns itself with the worthlessness of the original obligation (in this case, the obligations of Boyd and Jerry to their customers) rather than the worthlessness of the guarantor's or indemnitor's claim against the principal obligor. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 24–25, 200 (1954). See Propp, "What To Do About Bad Debts," 13th Ann. N.Y.U. Tax Inst. 109, 129 (1955). Nor are petitioners precluded from a deduction under section 166(f) merely because their undertaking of the indemnity obligation may have been motivated by their personal relationship with the principal, Boyd. See Surrey, "The Congress And The Tax Lobbyist—How Special Tax Provisions Get Enacted," 70 Harv. L. Rev. 1145, 1147 fn 4 (par. (g)) (1957).

Having decided that section 166(f) is broad enough to cover the facts of this case, we must now determine whether petitioners have satisfied the requirements of that section. Those requirements are four in number: (1) The taxpayer-payor is not a corporation; (2) the principal

is not a corporation; (3) the proceeds of the original obligation were used in the trade or business of the borrower; and (4) the principal's obligation is worthless to the payee(s) at the time of the payment, without regard to the guaranty, endorsement, or indemnity. Sec. 1.166-8(a)(1), Income Tax Regs.; 5 Mertens, Law of Federal Income Taxation, sec. 30.03a at 20–21 (1969 rev.).

There is no question as to the first two requirements, since, of course, neither the payors (petitioners) nor the primary obligors (Boyd and Jerry) were a corporation. The third requirement is also satisfied, since the original obligation was that Boyd would promptly account for and pay to the owners the proceeds of the sales of livestock consigned to him; and these proceeds (including the amount owed to McCleave), kept in the custodial account, were used to defray normal operating expenses of the auction barn.

Respondent argues, however, that petitioners have not satisfied the fourth requirement in that they have failed to prove that the obligations of Boyd and Jerry to McCleave and the other creditors[3] were worthless when the payment was made.

What we said above about Boyd's financial position need not be repeated here. As to Jerry, his only assets were household furniture, a Rambler automobile, a pickup truck on which he owed $1,500, an insurance policy with a cash surrender value of $2,200, and less than $100 in the bank. He withdrew the cash surrender value of his insurance to finance the return of his family—his wife and two children—to Iowa. He had held four jobs in 1965: As a farm laborer, an insurance salesman, a participant in the livestock auction business, and a mechanic, making $2 per hour or about $100 per week—hardly a record suggesting substantial future earnings. His liability as a partner in the auction barn had obviously rendered him insolvent.

A creditor is not required to be an "incorrigible optimist" in determining whether a debt is without value in a particular year. *United States* v. *White Dental Co.*, 274 U.S. 398, 403 (1927). The decision must be made in the exercise of sound business judgment, based upon as complete information as is reasonably obtainable. *Blair* v. *Commissioner*, 91 F. 2d 992, 994 (C.A. 2, 1937). Respondent emphasizes the youth of both Boyd and Jerry and argues that they might some day recoup their losses and be in a position to reimburse petitioners. But "value cannot be based on hope alone." *Denver & Rio Grande Western Railroad Co.* v. *Commissioner*, 279 F. 2d 368, 375 (C.A. 10, 1960), affirming 32 T.C. 43 (1959). A bare hope that some recovery might be

---

[3] Respondent does not argue that any part of the claims discharged by petitioners' payment of $10,000 was not covered by the bond or subject to the indemnity agreement. Thus, we treat the $10,000 as having been advanced by petitioners in connection with their obligation as indemnitors.

made in the future does not constitute a sound reason for postponing the time for taking a deduction for a worthless debt: a taxpayer need not "wait until some turn of the wheel of fortune may bring the debtor into affluence." *Minneapolis, St. Paul Railroad Co., et al.* v. *United States*, 164 Ct. Cl. 226, 241 (1964).[4] It is our conclusion that the claims of the auction barn customers against Boyd and Jerry were worthless, without regard to the bond and indemnity agreement, at the time petitioners made the payment of $10,000 in discharge of their obligation as indemnitors. See *Kate Baker Sherman, supra* at 752–753.[5]

In summary, petitioners' entitlement to a deduction under section 166(a) for the $10,000 advance can readily be seen by the following interpolation of the facts of this case into the provisions of section 166(f):

A payment by the taxpayer (other than a corporation) [petitioners] in discharge of part or all of his [their] obligation as a guarantor, endorser, or indemnitor [petitioners' obligation under the general indemnity agreement, when read in conjunction with General Live Stock Bond] of a noncorporate obligation [the obligation of Boyd, and later Jerry, to account to their customers for the proceeds of sales of livestock] the proceeds of which were used in the trade or business of the borrower [the proceeds of the livestock sales were used to defray the operating expenses of the auction barn] shall be treated as a debt becoming worthless within such taxable year * * *, but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) [both Boyd and Jerry were without assets and had limited earning potential] at the time of such payment.

*Decision will be entered under Rule 50.*

---

[4] The taxability of bad debt recoveries, sec. 111, guards against windfalls attributable to the premature allowance of deductions.

[5] Having decided that the deduction is allowable by reason of sec. 166(f), we do not reach petitioners' alternative argument that the $10,000 should be treated as a worthless nonbusiness debt under sec. 166(d). We note, however, that both petitioner and Jerry frankly admitted at the trial that neither regarded the $10,000 as a loan, but that the payment was made because petitioners would be liable for it under the indemnity agreement. Jerry's testimony in this connection, that he had "no way of making up this money," is consistent with our finding that his and Boyd's debts to their customers were worthless.