JOHN C. ECHOLS AND DEANNA O. ECHOLS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 38647-87.     Filed November 6, 1989.

*Leonard Bruce Locke* and *Victoria Sherlock*, for the petitioners.

*Melanie R. Urban*, for the respondent.

WHITAKER, *Judge:* By statutory notice dated October 27, 1987, respondent determined a deficiency in petitioners' Federal income tax for the years and in the amounts as follows:

| Year | Deficiency |
|------|-----------|
| 1974 | $23,645 |
| 1975 | 3 |
| 1976 | 49,450 |
| 1977 | 29,631 |

After concessions, the issues are (1) whether petitioners are entitled to deduct a capital loss pursuant to section 165(a)[1] with respect to a partnership, Mann Properties N/W Freeway Ltd., No. 2 (Freeway)[2] in 1976, and (2) whether respondent was properly notified that National Exporters, Inc. (Exporters) in which petitioner John Echols was a shareholder, did not qualify as a Domestic International Sales Corporation (DISC) for its fiscal year ending September 30, 1974.

Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated by this reference. At the time they filed their petition, petitioners were residents of Baytown, Texas. For convenience the two issues are addressed separately.

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] This partnership is sometimes described in documents in this record and in the stipulation as "Northwest Freeway Ltd. No. 2" and as "Mann Properties Northwest Ltd. No. 2."

*Mann Properties N/W Freeway, Ltd., No. 2*

### FINDINGS OF FACT

Prior to 1974, petitioner[3] was a partner in Freeway, holding a 37.5-percent interest. A similar interest was held by Scott Mann (Mann), with whom petitioner had been involved in other projects. Freeway's only asset was a tract of land in the Houston, Texas, area known as the Jersey Village tract. Mann secured a loan, guaranteed by petitioner, for the down payment on this property. The remainder of the purchase price was financed on a nonrecourse basis. Freeway hoped to resell the property at a profit since a new highway had been proposed to be built in the area of the tract, which Freeway's partners expected to attract development.

In 1974 local opposition stalled plans for construction of the highway. Moveover, the real estate market in the Houston area went into a slump, and Freeway was unable to sell the entire Jersey Village tract. Because of Freeway's inability to sell the tract, Mann was unable to service the debt which he had incurred for the downpayment on the property. On November 4, 1974, Mann and petitioner entered into an exchange agreement whereby, inter alia, Mann transferred his 37.5-percent interest in Freeway to petitioner in exchange for petitioner's assumption of the recourse debt which encumbered the tract. Petitioner actually paid these debts in 1974 and 1975.

Throughout 1974, petitioner and Joe Smith, Freeway's remaining partner who held a 25-percent interest, continued their attempts to sell the Jersey Village tract. A 50-percent interest in the tract was sold to another developer, Jim Smith, sometime in 1974. Jim Smith made payments on the tract in 1974 and 1975, but defaulted on his 1976 payment and notified Freeway that he would make no more payments on the tract. Upon being notified of Jim Smith's default,[4] petitioner called a meeting of both of Freeway's partners at which he informed Joe Smith that he would not continue to make his 75-percent share of the mortgage and

---

[3]All further references to petitioner are to John C. Echols.

[4]The record is silent with respect to the vehicle by which Jim Smith purchased his interest in the Jersey Village tract, although it appears that foreclosure proceedings were unnecessary for Freeway to regain title upon his default.

ad valorem tax payments on the tract. By this time, the fair market value of the tract had declined to less than the principal balance of the outstanding mortgage. When Freeway was unable otherwise to restructure the underlying debt, all efforts to sell the property ceased. The property was foreclosed upon by its mortgagees in February 1977.

### OPINION

The regulations provide that "a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." Sec. 1.165-1(d)(1), Income Tax Regs. However, there is no requirement that a taxpayer relinquish title in order to establish a loss if such loss is reasonably certain in fact and ascertainable in amount. *Middleton v. Commissioner*, 77 T.C. 310, 322 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982).

Both parties rely upon our holding in *Middleton v. Commissioner, supra.* In *Middleton,* the taxpayers were partners in a partnership that had purchased undeveloped real estate for investment using nonrecourse financing. When real estate values declined in the mid-1970's, the partners attempted to restructure their financing. When these attempts failed, the partnership notified the mortgagees that no additional note installments or tax payments would be made and tendered title to the property to the mortgagees, which was refused. We held that such steps were sufficient to constitute abandonment, and that a loss was allowable in the year title was tendered.

Respondent cites *Middleton* in conjunction with a recitation of the steps Freeway did not take during 1976. Respondent points out that Freeway retained on its books a receivable reflecting the note due from Jim Smith, did not write off its investment in the Jersey Village tract in 1976, did not designate Freeway's 1976 Federal income tax return as "final," and did not offer to reconvey the property to its mortgagees. In contrast, petitioner argues that the nonrecourse nature of the mortgage, the fact that the partners decided not to make further payments with respect to either the mortgage or ad valorem taxes, and the fact

that the fair market value of the property was less than the outstanding encumbrance, are all that is required for a finding of abandonment in accordance with *Middleton.*

In *Hopkins v. Commissioner,* 15 T.C. 160 (1950), the taxpayer inherited real property in New York City from his father which, in the years following the latter's death, was allowed to deteriorate to the extent that the city directed that it be razed. By that time, the outstanding tax liens had grown to an amount equal to or in excess of the property's fair market value. In August 1942, the city foreclosed on the property for the amount of the outstanding taxes. The taxpayer claimed a loss for the property's abandonment in 1941. However, the taxpayer could point to no identifiable event through which to claim his loss, and we held that substantial equivalence between the fair market value of the property and the outstanding tax liens was insufficient proof that all value had disappeared in 1941. We went on to state that:

Absent some objective identifiable event establishing the owner's recognition that his equity in the property has been lost through worthlessness we cannot hold that he is entitled to a loss in full within the taxable year. Mere inaction when declining market values and increasing tax arrearages point toward worthlessness will not suffice. * * * [*Hopkins v. Commissioner, supra* at 173.]

We think that Freeway's failure to manifest its abandonment through some act apparent to those outside the partnership is a point which distinguishes this case from *Middleton.* In *Middleton,* that act was the tender of legal title to the mortgagee. In *Freeland v. Commissioner,* 74 T.C. 970 (1980), the act was a voluntary conveyance to the mortgagee. While we do not hold that conveyance or even tender of title is necessary to consummate an abandonment, we do hold that for an abandonment to be effective for purposes of section 165(a), the abandoning party must manifest an intent to abandon by some overt act or statement reasonably calculated to give a third party notice of the abandonment. Petitioner bears the burden of proof in this case, and he has produced no evidence of any such act

or statement that was not confined to Freeway's partners.[5] We therefore find that the earliest identifiable event to which a recognizable loss may be tied is the actual foreclosure, which occurred after the year in which the loss was claimed. We therefore find for respondent on this issue.

*National Exporters, Inc.*

### FINDINGS OF FACT

During 1974 and 1975, petitioner was a 40-percent shareholder in Exporters. Exporters was organized to assist Polyolefins, Inc. (Polyolefins) in the export of polyethylene reprocessed by the latter. Petitioner was also a 40-percent shareholder in Polyolefins. The other shareholders of both corporations were B. B. Jones (Jones), who held 50 percent, and Dwain Epting (Epting), who held 10 percent. Petitioner was neither an officer nor an agent of Exporters. On December 2, 1973, Exporters filed its election to be taxed as a Domestic International Sales Corporation (DISC). On its tax return for its fiscal year ended September 30, 1974, Exporters reported taxable income of $413,545. None of this income was distributed to Exporters' shareholders. Rather, the vast majority of Exporters' profits was loaned to Polyolefins, ostensibly as producer's loans.[6] However, rather than use these funds for permissible purposes, Polyolefins loaned part of the money to two new corporations, and approximately $209,000 to Jones. No loan documents were executed, and none of the loans were repaid.

Exporters' fiscal year 1974 tax return was selected for audit and was examined by revenue agent William Weatherby. The 1975 fiscal year was also audited. Exporters' income in the 1975 fiscal year was negligible. Since the loans made to Polyolefins did not qualify as producer's loans, agent Weatherby determined that Exporters did not qualify as a DISC, as it did not meet the 95-percent qualified export assets test of section 992(a)(1)(B). Agent Weatherby in his report dated May 4, 1977, recommended that Exporters be disqualified as a DISC and its income reallo-

---

[5]Petitioner states on brief that Freeway received an acceleration notice from one or more of its lenders. As this assertion is not supported by the record, we express no opinion upon the effect of any such notice.

[6]See sec. 995(d).

cated to Polyolefins pursuant to section 482. This recommendation had been discussed with Epting during an audit conference on Exporters' 1974 and 1975 fiscal years. Epting prepared Exporters' tax returns and represented Exporters on audit pursuant to a valid power of attorney, but he was not otherwise an officer or agent of Exporters. Epting left the conference with Weatherby under the impression that Exporters would be disqualified as a DISC, a determination to which he did not object and in fact desired, since he, Jones, and petitioner had been taxed on a portion of Exporters' income pursuant to section 995(a), but never received any funds because of the above-described disposition of that income.

Subsequent to the submission of his first report dated May 4, 1977, agent Weatherby learned that Polyolefins was insolvent. In order to protect the interest of the Internal Revenue Service in collecting any deficiency, agent Weatherby recommended in a supplemental report dated August 7, 1978, that Exporters' DISC election be allowed to remain in effect and that deficiencies be determined with respect to its shareholders.

The record does not reflect the date of the conference between Weatherby and Epting, but it obviously took place prior to Weatherby's supplemental report dated August 7, 1978. In any event, that audit conference must have taken place well prior to the running of the period of limitations on Exporters' 1974 and 1975 income tax returns.

Neither Exporters nor anyone on its behalf ever gave respondent or any of his agents written notice that Exporters was not a DISC for its fiscal year ending September 30, 1974.

### OPINION

Petitioner argues that Exporters did not qualify as a DISC for its fiscal years ending September 30, 1974, and 1975, but that it should be taxed as a "normal" corporation. Therefore, petitioner argues that, since Exporters made no actual distributions to him, he has received no income, dividend, or otherwise, upon which to be taxed. Respondent argues that pursuant to section 1.992-1(g), Income Tax

Regs., he is allowed to treat Exporters as a DISC despite its admitted noncompliance with the DISC provisions.

Section 1.992-1(g), Income Tax Regs., states:

(g) Status as DISC after having filed return as a DISC. Under section 992(a)(2), notwithstanding the failure of a corporation to meet the requirements of paragraph (a) of this section for a taxable year, such corporation will be treated as a DISC for purposes of the Code for such taxable year (and, thus, will not be able to claim that it is not eligible to be a DISC) if—

(1) Such corporation files a return as a DISC for such taxable year,

(2) Such corporation does not notify the district director, more than 30 days before the expiration of the period of limitation (including extensions thereof) on assessment for underpayment of tax for such taxable year * * * that it is not a DISC for such taxable year, and

(3) The Internal Revenue Service has not issued, within such period of limitation (including extensions thereof) on assessment for underpayment of tax for such taxable year, a notice of deficiency based on a determination that such corporation is not a DISC for such taxable year.

There is no dispute that the first and third of these requirements are satisfied. The sole dispute is whether Exporters notified respondent that it was not a DISC prior to 30 days before the period of limitations expired for its fiscal year ended September 30, 1974. One commentator has described the purpose of this requirement of the regulations as follows:

This keeps corporations from claiming normal corporate status after expiration of the statute of limitations. Such a claim, if upheld, would result in abuse, since favorable treatment for what would otherwise be undistributed DISC income could be obtained by treating the entity as a regular corporation on actual distribution. For example, shareholders must include undistributed DISC income as ordinary income when a corporation is liquidated. Sec. 995(c). If a corporation could claim that it was not a DISC at the time the income was earned, the gain on liquidation would be taxed as capital gain. Since the limitations period would have run, the corporation would have escaped tax at the corporate level.

P. Postlewaite, International Corporate Taxation, sec. 8.02, n. 7 (1980).

Respondent's argument focuses on the perceived technical requirements of the regulation. He argues that Exporters could comply with the notification requirement of section 1.992-1(g), Income Tax Regs., only through some affirmative act of a corporate officer. Respondent contends that even if

Epting's tacit agreement to agent Weatherby's determination of disqualification was a sufficient act, Epting was not an officer or agent capable of giving the appropriate notification. However, while the regulation requires notification by the corporation, it sets forth no procedure nor does it explicitly state who shall provide such notification. There is no basis for concluding that the notification was required to be in writing or in a particular form. For the reasons set forth we conclude that notification was given to respondent.

Respondent argues that Epting was not an officer authorized to provide notice of Exporters' disqualification and that giving notice under section 1.992-1(g), Income Tax Regs., was not within the scope of his power of attorney. However, Epting was the preparer of the income tax return under audit and was acting under a power of attorney to represent Exporters in the audit conference. Respondent recognized Epting's authority to speak for the corporation. Thus, we conclude that Epting was authorized to accept on behalf of Exporters respondent's finding that the corporation did not qualify as a DISC. We further hold that such action by Epting constitutes notification for purposes of this regulation. Under these circumstances respondent cannot hide behind his regulations.

Moreover, while the letter of the regulation places the onus of notification upon the corporation, we will not construe the regulation so as to require a useless act by Exporters. *Andrew v. Commissioner,* 54 T.C. 239, 246 (1970). Formal notice, written or otherwise, by Exporters that it is disqualified adds nothing to respondent's recognition of its non-DISC status as related to Epting by agent Weatherby. We think that the purpose of section 1.992-1(g), Income Tax Regs., is to bind a corporation to its DISC election to the extent that respondent reasonably relies upon the corporation's continued representation that it is a duly qualified DISC. However, once respondent has concluded during the course of an audit that a corporation is no longer qualified as a DISC, his reliance upon a representation of qualification by reason of the filing of DISC tax returns for the years audited is no longer reasonable. At that point respondent would normally issue a notice of deficiency. Respondent cannot convert the shield which

section 1.992-1(g), Income Tax Regs., creates, into a sword for tax collection purposes. While we express no opinion concerning the propriety of determining a deficiency on the basis of ability to pay, we find that in this case[7] respondent must accept the fact of Exporters' disqualification as a DISC.

We hold for petitioner on this issue. Accordingly,

*Decision will be entered under Rule 155.*

---

[7]Neither do we express an opinion upon the application of sec. 1.992-1(g), Income Tax Regs., in any case where notice of disqualification is in dispute. However, we note that a corporation's actual communication of such disqualification would obviate the issue.