T.C. Memo. 1999-183


UNITED STATES TAX COURT


MANN CONSTRUCTION CO., INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27187-96.                    Filed June 3, 1999.


Richard Mann (an officer), for petitioner.

<u>Shirley M. Francis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  Respondent determined deficiencies of $32,199 and $13,464 in petitioner's Federal income tax for the tax years ended July 31, 1992, and July 31, 1993, respectively.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references

are to the Tax Court Rules of Practice and Procedure, unless otherwise specified.

Following a concession by petitioner,[1] the only issue for decision is whether petitioner is entitled to a section 166 "bad debt" deduction for funds it advanced to one of its construction superintendents, who is also the son of its president and controlling shareholder. Petitioner deducted the full amount of these advances remaining unpaid (plus accrued "interest") on the return for its tax year ending July 31, 1992. Respondent denied this deduction in its entirety. The deficiency still disputed for petitioner's tax year ending July 31, 1993, is a computational adjustment arising from a reduced carryforward that would result if we should sustain respondent's disallowance of the bad debt deduction for 1992.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found; the stipulation of facts and related exhibits are incorporated by this reference.

Petitioner's principal place of business was Redmond, Oregon, when it filed the petition. Petitioner uses the accrual method of accounting for Federal income tax purposes.

_____

[1] Petitioner has conceded a $12,805 "shareholder expenses" deduction claimed for the tax year ended July 31, 1992.

Petitioner is an Oregon corporation incorporated in 1963. Since its incorporation, petitioner's president, Richard Mann, has always owned 70 percent of petitioner's stock; Alice Mann (Richard Mann's wife) has always owned the remaining 30 percent.

As its name suggests, petitioner is in the construction business. Petitioner has completed construction projects in the $1 to $7 million range, including projects on military bases and in national parks.

During most of the 1980's and early 1990's, petitioner's business was depressed. From May 1980 through June 1984, petitioner bid on construction projects throughout the western United States, but did not obtain any contracts. Petitioner did obtain contracts for construction projects after June 1984, but it continued to suffer from the economic downturn in the construction industry, and most of its employees had to find other jobs.

Shortly after petitioner's difficulties began--in or about 1981--petitioner started advancing funds to Richard and Alice Mann's son, Mark Mann. Richard Mann believed these advances, which Mark Mann used to pay his basic living expenses, were necessary to ensure that petitioner would always have an experienced construction superintendent available during the business downturn. During that period, Mark Mann did work for

petitioner as a construction superintendent, when petitioner obtained jobs.

Petitioner continued to advance funds to Mark Mann for more than 10 years; i.e., until April 1992. Mark Mann made some repayments during this period. One of these repayments was relatively large, approximately $28,000, and represented Mark Mann's entire after-tax bonus from a successful Government contracting job in 1986-87. This $28,000 repaid all "interest" accrued but unpaid as of the date of the payment, and some "principal". However, after 1985 there was always a large balance due petitioner.

No evidence in the record discloses whether petitioner and Mark Mann observed the formalities of debt, when the advances began. However, starting no later than 1982, petitioner treated the advances to Mark Mann as loans in its internal accounting records and on its financial statements to third parties. Also beginning no later than 1982, petitioner reported the advances as a loan on its tax returns. Accordingly, petitioner included the "interest" on the advances in its taxable interest income as it accrued, whether or not that interest was paid.[2]

---

[2] Petitioner did not, however, accrue any interest on the advances for the year in which it claims the advances became worthless (the tax year ended July 31, 1992).

During petitioner's tax year ended July 31, 1992, the advances were represented by a document entitled "Demand Note Renewal", dated July 31, 1991. This note provided as follows:

> I, Mark Mann, promise to pay to Mann Construction Co.,
> Inc., the sum of $103,043.30 to reimburse the company
> for cash advances and interest accrued to date.
> Payment to be made from project management salaries and
> bonuses in amounts commensurate with earnings.
>
> This note will continue to bear interest at 9% per year
> until paid in full. Payments shall be applied first to
> interest and then to principal.[3]

This 1991 document is the only note currently in existence evidencing Mark Mann's obligation to repay the advances. However, beginning no later than 1982, petitioner and Mark Mann executed similar notes frequently, which stated the then-current interest rate and balance due.

Other than these notes, there was no written loan agreement between petitioner and Mark Mann. Also, there was no fixed schedule for repayment of the advances, and Mark Mann did not provide petitioner with any collateral to secure his claimed obligation to repay the advances.

Petitioner has stipulated that "Mark Mann's repayment of the advances was contingent upon his future earnings", and the

---

[3] Notwithstanding the note's reference to "cash advances and interest accrued to date", the $103,043.30 stated amount was in fact only the "principal" amount advanced as of July 31, 1991; it did not include the $8,854.10 of accrued but unpaid "interest" as of that date.

repayments Mark Mann made in fact came primarily from the salary and bonuses he earned working for petitioner. However, Mark Mann also made several repayments to petitioner while he was working for another company (the Ross Bros. firm).

During the approximately 10 years petitioner advanced funds to Mark Mann:

1. Petitioner advanced a total of $126,653 to Mark Mann;

2. petitioner accrued $48,396 in "interest" on the $126,653 advanced, resulting in aggregate balances due petitioner of $175,049; and

3. Mark Mann repaid petitioner a total of $57,046, leaving a balance due, as of July 1992, of $118,003.

On July 30, 1992, Richard Mann, on behalf of petitioner, signed a document entitled "Resolution", which stated:

In view of Mark Mann's financial circumstances, together with the Company's lack of work the last few years and with no promise of contracts in sight, it is to the company's best interest to write off this loan.

It is therefore resolved to cancel this loan in its entirety, effective July 30, 1992.

Petitioner deducted the entire $118,003 balance due from Mark Mann as a worthless bad debt, on its tax return for the year ended July 31, 1992; of this balance due, $6,106 represented advances made after July 31, 1991.

When it canceled the advances on July 30, 1992, petitioner had not made any written demand for payment, attempted to

negotiate any agreement for partial payment, or otherwise taken any legal action to try to collect from Mark Mann.  However, as of July 21, 1992, Mark Mann's liabilities to parties other than petitioner were approximately $24,256; his only assets were a travel trailer that served as his residence, worth approximately $5,200, and a used truck, worth approximately $2,000.

In addition, approximately a year prior to petitioner's cancellation of the advances--in approximately July 1991--Mark Mann had sought credit counseling.  At that time, Mark Mann listed the balance then due petitioner as one of his debts, and the counseling service recommended bankruptcy.

Moreover, in September 1991 Mark Mann became unemployed.  He remained unemployed throughout 1992, and collected unemployment compensation during most or all of that year.  As a result of this unemployment, Mark Mann became unable to make the payments arranged by the credit counseling service as they came due, and he was struggling with his financial obligations flowing from a recent divorce.

Finally, in March 1992 petitioner decided to discontinue, and sold many of the assets of, its Government contracting business, in which Mark Mann had worked.

Prior to his period of unemployment beginning in September 1991, Mark Mann had always believed he would be able to repay

petitioner's advances, and Richard Mann and he had never discussed forgiving or canceling them.

When petitioner canceled Mark Mann's obligation to repay the advances, Mark was 37 years old. At that time, Mark's required child support payments were $800 per month; he was also required to make support payments to his former wife.

After the cancellation of the advances, Mark Mann did not obtain full-time work until June 1995. In that month, Mark accepted a position as the construction manager for the Confederated Tribes of Warm Springs, at a salary of $52,000 per year. At the time of trial (in March 1998) Mark still held this position, at the same salary, with no bonus or other contingent compensation arrangements.

Mark Mann had not attained solvency at the time of trial.

OPINION

Subject to the limitations set forth in section 166(d) and (e), which are not at issue here, section 166(a)(1) allows a deduction for any debt that becomes worthless within the taxable year. This "bad debt" deduction applies only to obligations that are bona fide debt, as defined by section 1.166-1(c), Income Tax Regs., and the applicable case law.

Petitioner must prove its entitlement to the bad debt deduction. See Rule 142(a); Welch v. Helvering, 290 U.S. 111

(1933). Therefore, to prevail, petitioner must prove that its advances to Mark Mann: (1) Were bona fide debt, and (2) became worthless during the tax year for which they were deducted (the year ended July 31, 1992). Respondent asserts that petitioner fails on both counts.

I. Were The Advances Legally Valid and Enforceable Bona Fide Debt?

Bona fide debt is debt that arises from a debtor-creditor relationship, based upon a legally valid and enforceable obligation to pay a fixed or determinable sum of money. See sec. 1.166-1(c), Income Tax Regs. To prove that the advances were bona fide debt, petitioner must therefore show that the advances: (1) Were not "contingent" (i.e., were a legally valid and enforceable obligation), and (2) arose from a debtor-creditor relationship between petitioner and Mark Mann. See Andrew v. Commissioner, 54 T.C. 239, 244-245 (1970); Clark v. Commissioner, 18 T.C. 780, 783-784 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953). Respondent asserts petitioner has met neither of these requirements.

A. Were The Advances Legally Valid and Enforceable Obligations?

The July 31, 1991, note provided in part that "Payment [was] to be made from project management salaries and bonuses in amounts commensurate with earnings." We have found that similar notes existed in prior years. The parties have stipulated that

"Mark Mann's repayment of the advances was contingent upon his future earnings", and the repayments Mark Mann made in fact came primarily from the salary and bonuses he earned working for petitioner.

For these reasons, respondent argues that, even if petitioner and Mark Mann intended to create a debtor-creditor relationship, Mark Mann's repayment of the advances was too "contingent" for the advances to constitute a valid and enforceable bona fide debt obligation.  In considering this argument, it is useful to distinguish contingencies that affect a borrower's <u>legal obligation</u> to repay (such as conditions precedent, which must be satisfied before the borrower is contractually obligated to repay), from contingencies that affect the borrower's <u>financial ability</u> to repay.

If a borrower's legal obligation to repay is subject to a contingency, no valid and enforceable debt exists--and no bad debt deduction is therefore allowable--if the contingency has not occurred.  See <u>Clark v. Commissioner</u>, <u>supra</u> (borrower promised to repay only if she received sufficient dividends on certain stock; held, no debt existed--and no bad debt deduction was allowable-- where no dividends were ever paid).  Where a borrower's promise and obligation to repay are unconditional, however, a valid and enforceable debt may exist--and a bad debt deduction may be proper--even if the borrower's financial ability to repay is

subject to one or more contingencies or conditions.  See <u>Hunt v. Commissioner</u>, T.C. Memo. 1989-335 (borrowers' ability to repay depended to a sizeable extent on increased value of their investments in silver, but their obligations to pay were fixed and absolute; held, debt not "contingent", and bad debt deduction could be proper, despite the "risk" that the borrowers could not repay); see also <u>Goldstein v. Commissioner</u>, T.C. Memo. 1980-273, where we found that the Commissioner had confused

> the concept of a contingency which invalidates the bona fide nature of a loan with the risks that are inherent in any loan transaction.  There is always some element of risk that a loan might not be repaid.  The existence of this risk does not mean, however, that repayment is contingent on the nonoccurrence of that risk.  * * *

After reviewing the entire record, we are convinced petitioner's stipulation that Mark Mann's repayment of the advances was "contingent" was not an admission that Mark's <u>promise or obligation</u> to repay was conditioned upon his receiving sufficient future earnings from petitioner.  Rather, it was an acknowledgment that Mark's <u>ability</u> to repay depended on his having gainful future employment.  This latter kind of contingency or risk (which often exists in the case of unsecured debt) may be a relevant factor in determining whether the advances were bona fide debt, because it affects the likelihood of repayment.  However, it does not by itself render contingent,

invalid, or unenforceable Mark's agreement to repay petitioner's advances.

Of course, we must still consider whether Mark Mann's obligation to repay petitioner was contingent, on the basis of the evidence other than petitioner's stipulation.

Respondent is correct that if a borrower promises to repay only from a specified fund, the borrower's obligation will generally be treated as contingent, and no bad debt deduction will be allowed. See Ewing v. Commissioner, 20 T.C. 216, 229 (1953) (payment only from operating profits), affd. on other grounds 213 F.2d 438 (2d Cir. 1954); Clark v. Commissioner, supra (payment only from dividends on certain stock); 17A Am. Jur. 2d Contracts sec. 496 (1991) (promise to pay out of a specified fund generally renders contract conditional). But cf. Clay Drilling Co. v. Commissioner, 6 T.C. 324 (1946) (bad debt deduction allowed even though debt was repayable only from future commissions to be earned by debtor). An obligation to repay will also generally be found to be contingent if the borrower promises to repay only when financially able to do so. See Zimmerman v. United States, 318 F.2d 611 (9th Cir. 1963) (no valid debt existed--and no bad debt deduction was proper--where repayment was to be made only when the borrower could carry itself financially, and only in whatever amount could be paid without jeopardizing the borrower).

Respondent asserts that Mark Mann's obligation to repay the advances was contingent, because Mark promised to repay only from the future salary and bonuses (if any) he would receive from petitioner.  Respondent's argument emphasizes the provision of the July 31, 1991, note that "Payment [is] to be made from project management salaries and bonuses in amounts commensurate with earnings."  Standing alone, this language could appear, as respondent contends, to limit Mark Mann's obligation to repay to his future earnings from petitioner.  However, as the Supreme Court of Oregon has stated, in Mignot v. Parkhill, 391 P.2d 755, 759 (Or. 1964):

> It is not always easy * * * to determine whether the intention of the parties is to limit the right of the promisee to payment from a specified fund.
>
>     *    *    *    *    *    *    *
>
> It is difficult to formulate a definite general rule and the decision in each case must be dependent upon its own circumstances * * *.  * * *

In this case, the note does not state that payment is to be made only from Mark's future earnings from petitioner, and the evidence suggests that Mark and petitioner did not intend to exclude other sources of repayment.  For example, Mark Mann testified that his repayment of the advances depended more on his income in general, than on his earnings from petitioner.  Mark further testified that Richard Mann and he had never discussed forgiving or canceling his obligation to repay the advances,

until after he had lost his job at another firm.  We found this testimony credible in itself.  Moreover, it is supported by the fact that Mark made some repayments while he worked for a company other than petitioner.  Because one generally does not make gratuitous payments to his creditors, these repayments strongly suggest that Mark's promise and obligation to repay were not limited to his earnings from petitioner.

In addition, the language in the note referring to Mark's earnings does not stand alone.  It follows a sentence stating Mark Mann's clear and unconditional promise to repay the advances in full.

When a contract contains both an unambiguous, unconditional promise to pay, and language that appears to limit the payment promise to a specified fund, courts are reluctant to find that the limiting language governs.  As the Supreme Court of Oregon also wrote in Mignot v. Parkhill, supra at 759, in finding that a contractor's promise to pay for work performed was not contingent, notwithstanding a provision that the contractor was not obligated to pay until he had himself received payment:

> We think, however, that where the contract contains a definite and unambiguous promise to pay * * * equally clear and unambiguous language, expressing the intention that the happening of a contingency over which the promisee has no control shall be a condition precedent to payment, must be found in the contract before the positive and absolute agreement to pay will be considered as superseded.  * * *

Or, as the Court of Appeal of California has written, in

Sunniland Fruit, Inc. v. Verni, 284 Cal. Rptr. 824, 828 (Ct.

App. 1991) (grower's obligation to repay broker's advances not

conditional, notwithstanding provision that the advances would be

deducted from funds due the grower after sale of grower's fruit):

> When the money claimed is an identifiable debt and
> there is no evidence establishing that the party
> advancing the monies assumed the risk inherent in the
> venture, identification of a particular pool of money
> as a source of payment does not limit or preclude
> recovery from other sources when the pool fails to
> materialize unless the agreement expressly so states.
> * * *

Considering the note in its entirety, we find that the

clause referring to Mark Mann's earnings is too ambiguous to be

treated as an express limitation on his clearly stated and

unconditional promise to repay the advances in full.  We

therefore disagree with respondent's assertion that Mark was only

required to repay from his future earnings from petitioner.  On

the basis of the entire record, we find that petitioner and Mark

Mann expected Mark's earnings from petitioner would be both the

likely and a convenient source of repayment, but they did not

intend or agree that Mark was obligated to make repayments only

from that source.  See Andrew v. Commissioner, 54 T.C. at 245;

Bowman v. Commissioner, T.C. Memo. 1995-259.  We therefore

conclude that Mark Mann and petitioner intended Mark to be

unconditionally obligated--and that Mark was in fact so

obligated--to repay the full amount of the advances.  As a result, we also conclude that Mark Mann's obligation to repay petitioner's advances was not "contingent" in the sense asserted by respondent; it was a valid and enforceable obligation for purposes of the bad debt deduction.

B.  Did Petitioner and Mark Mann Create a Debtor-Creditor Relationship with Respect to The Advances?

Although the advances were not "contingent" in the sense asserted by respondent, this does not necessarily mean they were bona fide debt.  Petitioner must also prove that Mark Mann and petitioner created a debtor-creditor relationship with respect to the advances.  See supra p. 9.

Whether a bona fide debtor-creditor relationship exists depends on all the facts and circumstances, and generally no one fact is determinative.  An essential question is whether there is a good-faith intent on the part of the recipient of the funds to make repayment, and a good-faith intent on the part of the person advancing the funds to enforce repayment.  In determining whether such intent exists, we consider all the evidence, and we evaluate whether there was a reasonable expectation of repayment in light of the economic realities of the situation.  See Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970); G.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. 649, 656 (1968), remanded

pursuant to agreement of the parties 406 F.2d 290 (6th Cir. 1969).

Intrafamily transactions are subject to rigid scrutiny and may be presumed to be gifts rather than loans.  However, any such presumption may be rebutted by an affirmative showing that there was at the time of the transaction a real expectation of repayment and a real intent to enforce the collection of the asserted debt.  See Estate of Van Anda v. Commissioner, 12 T.C. 1158 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951).

To determine whether a debtor-creditor relationship with a reasonable expectation of repayment exists, we consider, among other factors, whether:

1.  A note or other evidence of indebtedness exists;

2.  interest is charged;

3.  there is a fixed schedule for repayment;

4.  any security or collateral is requested;

5.  there is any written loan agreement;

6.  a demand for repayment has been made;

7.  the parties' records reflect the transaction as a loan;

8.  any repayments have been made; and

9.  the borrower was solvent at the time of the loan.

See Hunt v. Commissioner, T.C. Memo. 1989-335.

At trial, both Mark Mann and Richard Mann testified about petitioner's and Mark Mann's relationship concerning the

advances.  Three other witnesses--petitioner's long-time bookkeeper, Judy Williams, petitioner's long-time accountant, Ryan Patrick, and petitioner's bonding agent from 1987-91, Eric Sander--also testified on behalf of petitioner, on the basis of their personal knowledge of petitioner's business, including the business relationship between petitioner and Mark Mann.

We found the testimony of all five witnesses credible, forthright, and consistent.  In addition, we note that Richard Mann, although he is not a lawyer, very ably represented petitioner at trial.

The entire record discloses that some of the traditional indicia of a debtor-creditor relationship were present in this case, and that some were not.  For example, there was no fixed schedule for repayment, no collateral, and no written loan agreement (other than the notes), and petitioner never demanded payment, much less took legal action to try to enforce repayment.  However, starting within a short time after the advances commenced, the advances were evidenced by notes; interest was charged; and petitioner's accounting records and financial statements reflected the advances as loans.  More importantly, petitioner reported the advances as loans on its tax returns, and accordingly included substantial amounts of interest in its taxable income.  In addition, Mark Mann made some repayments from time to time, including one relatively large repayment of

approximately $28,000, which represented his entire after-tax bonus from a successful contracting job. This accrual of taxable interest and this repayment made from taxable salary are strong circumstantial evidence that petitioner and Mark Mann intended to create a debtor-creditor relationship and did nothing to impair that relationship over the life of the advances.

With respect to Mark Mann's solvency, there is little in the record about his financial condition when the advances began. However, it is clear that in July 1992 Mark's liabilities were substantially in excess of his assets, and we believe it quite likely that Mark had been in financial difficulty for some period prior to that time. Nevertheless, prior to his period of unemployment beginning in September 1991, Mark Mann had always believed he would be able to repay petitioner's advances, and Richard Mann and he had never discussed forgiving or canceling them. Petitioner's accountant credibly testified that he had never had any reason to suspect Mark would not be able to repay the advances, and that petitioner always intended to be repaid. Petitioner's bookkeeper, and petitioner's bonding agent, also both testified that they never thought Mark would be unable to repay the advances.

On the basis of all the facts and circumstances of this case, we find that petitioner and Mark Mann intended to create and did create a real debtor-creditor relationship, when the

advances began.  We also find that this debtor-creditor relationship continued--with a reasonable expectation of repayment based on Mark Mann's actual and potential employment with petitioner, and on Mark's employment with the Ross Bros. firm--until the end of petitioner's tax year ended July 31, 1991. Accordingly, we find that advances made and interest accrued prior to (or on) July 31, 1991, were bona fide debt.

In or around July 1991, however, Mark Mann sought credit counseling, and the counseling service recommended bankruptcy. In September 1991, Mark became unemployed, and he remained unemployed throughout 1992.  As a result of this unemployment, during petitioner's tax year ended July 31, 1992, Mark Mann was no longer able to meet his obligations as they came due. Moreover, in March 1992 petitioner decided to discontinue, and sold the assets of, its Government contracting business, in which Mark had worked.  Finally, it is clear that on July 21, 1992, Mark's liabilities to parties other than petitioner significantly exceeded his assets.

For all these reasons, we find that during petitioner's tax year ended July 31, 1992, Mark Mann's financial situation had deteriorated to such an extent that petitioner no longer had a reasonable expectation of repayment.  We therefore find, on the basis of all the facts and circumstances, that petitioner and Mark Mann could not have intended to create, and did not create,

a debtor-creditor relationship with respect to the $6,106 of advances made during petitioner's tax year ended July 31, 1992. See Fisher v. Commissioner, 54 T.C. at 910-911. Accordingly, such advances were not bona fide debt.

II.  Did The Advances Become Worthless During
     Petitioner's Tax Year Ended July 31, 1992?

A bad debt deduction for a wholly worthless debt is allowable only for the taxable year in which the debt becomes worthless. See sec. 166(a)(1). There is no standard test for determining worthlessness; whether and when a debt becomes worthless depends on all the facts and circumstances. It is generally accepted, however, that the year of worthlessness is to be fixed by identifiable events constituting reasonable grounds for abandoning any hope of recovery. See Crown v. Commissioner, 77 T.C. 582, 598 (1981).

It is often very difficult to determine the precise moment a debt becomes worthless. This is particularly true when a debtor's financial situation deteriorates over time. However, it is clear that in making the determination the creditor must be neither an "incorrigible optimist" nor a "stygian pessimist". See Minneapolis, St. Paul R.R. v. United States, 164 Ct. Cl. 226, 241 (1964); Barrett v. Commissioner, T.C. Memo. 1996-199, affd. per curiam without published opinion 107 F.3d 1 (1st Cir. 1997). The creditor's decision must be made in the exercise of sound

business judgment, based upon information that is as complete as is reasonably obtainable. See Andrew v. Commissioner, 54 T.C. at 248.

Respondent asserts that petitioner's advances to Mark Mann did not become worthless during petitioner's tax year ended July 31, 1992. In the role of pessimist, respondent notes that if, as we have found, Mark Mann was deeply insolvent in July 1992, it is likely that his financial position had been precarious in some prior years. On the other hand, in the role of optimist, respondent notes that at trial (in 1998) Mark Mann testified he had made some progress with his remaining debts since 1992 (although he had not attained complete solvency).

Of course, we recognize that Mark Mann had been in financial difficulty for some time prior to petitioner's tax year ending July 31, 1992. We have found, however, that petitioner had a reasonable expectation of repayment until the beginning of that year, on the basis of Mark's employment (or potential future employment) with petitioner, and his employment with another firm. Therefore, we find that petitioner's right to repayment for the advances had at least some value as of the beginning of its taxable year ended July 31, 1992.

We also recognize that Mark was a young man (37 years old) during petitioner's tax year ended July 31, 1992, and he had many potential earning years ahead of him. However, around the

beginning of petitioner's 1992 tax year, Mark Mann sought credit
counseling, and the counseling service recommended bankruptcy.
In addition, during petitioner's 1992 tax year, Mark Mann became
(and remained) unemployed and could not meet his obligations as
they came due.  Moreover, also during petitioner's 1992 tax year,
petitioner discontinued and sold the assets of the business in
which Mark had worked.  Finally, it is clear that Mark's
liabilities greatly exceeded his assets as of the end of that tax
year.  We find that these identifiable events gave petitioner
clear and definite grounds for abandoning any hope of recovering
the advances, as of the close of its 1992 tax year.

Therefore, keeping respondent's arguments--and the
difficulty of determining the time of worthlessness--in mind, the
evidence has convinced us that petitioner's business judgment
with respect to the value of the advances was sound.  We find
that petitioner's advances to Mark Mann (and the accrued interest
thereon) became worthless during petitioner's tax year ended July
31, 1992.[4]

Respondent notes that petitioner did not take legal action
to enforce repayment of the advances.  Of course, the results of

---

[4] Hindsight confirms petitioner's judgment.  The fact that
Mark Mann had not attained solvency 6 years after petitioner
canceled the advances--which had constituted approximately 83
percent of Mark's liabilities--further indicates that the
advances were worthless when petitioner canceled them.

collection efforts may serve as evidence of worthlessness. However, such action is not required. See Smyth v. Barneson, 181 F.2d 143 (9th Cir. 1950); Bowman v. Commissioner, T.C. Memo. 1995-259. Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of worthlessness. See sec. 1.166-2(b), Income Tax Regs.

We find that the surrounding circumstances so indicated in this case, during petitioner's tax year ended July 31, 1992. Among the other factors discussed above, we note that as of July 21, 1992, Mark Mann was insolvent in both balance sheet and bankruptcy terms. His total liabilities (including the advances) were approximately $142,259; his assets were approximately $7,200, and consisted of his travel trailer/residence and his used truck. Also, as a result of his unemployment, Mark had become unable to meet his obligations as they came due. For these reasons, it is clear that if petitioner had sought to collect the advances, Mark Mann would have been forced to declare bankruptcy, and petitioner would most likely have received nothing. Where a creditor is familiar with the debtor's circumstances and knows that the debtor is hopelessly insolvent, he need not attempt to collect the debt where his attempts to do

so would be futile.  See <u>Andrew v. Commissioner</u>, 54 T.C. at 245-246; <u>Bowman v. Commissioner</u>, <u>supra</u>.

We hold that the $120,547 of advances petitioner made to Mark Mann on or before July 31, 1991, and the $48,396 of interest petitioner accrued on those advances on or before that date, less the repayments Mark made of $57,046, were bona fide debt that became worthless during petitioner's taxable year ended July 31, 1992.  We further hold that the $6,106 in advances made after July 31, 1991, did not constitute bona fide debt and was not eligible for the section 166 bad debt deduction.

To reflect all the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.