T.C. Memo. 2009-42

UNITED STATES TAX COURT

ABDASSLAM AND SUSAN ALAMI EL MOUJAHID, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20795-07.                    Filed February 23, 2009.

Abdasslam and Susan Alami El Moujahid, pro sese.

Michael W. Bitner, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined a $2,480 deficiency
in petitioners Abdasslam (Mr. Alami) and Susan (Ms. Alami) Alami
El Moujahid's Federal income tax for 2004 and a $9,021 deficiency
in petitioners' Federal income tax for 2005.  After concessions

by both parties,[1] the issues left for decision are: (1) Whether petitioners are entitled to unreimbursed employee business travel expense deductions for 2004 and 2005; (2) whether petitioners are entitled to other unreimbursed employee business expense deductions for 2004 and 2005; (3) whether petitioners are entitled to charitable contribution deductions for 2004 and 2005; and (4) whether petitioners are entitled to an abandonment loss deduction for 2005.

---

[1] Petitioners conceded the following unreimbursed employee business expenses: An education expense of $500 incurred in 2004 and a publication expense of $255 incurred in 2005.

Respondent conceded the following unreimbursed employee business expenses incurred by Mr. Alami: Union dues expenses of $761 incurred in 2004 and $938 incurred in 2005, tool expenses of $1,052 incurred in 2004 and $180 incurred in 2005, uniform maintenance expenses of $552 incurred in 2004 and $140 incurred in 2005, a license expense of $115 incurred in 2004, and a soccer expense of $195 incurred in 2005.

Respondent conceded the following unreimbursed employee business expenses incurred by Ms. Alami: A license expense of $85 incurred in 2004 and a uniform maintenance expense of $260 incurred in 2005.

Respondent conceded $500 of petitioners' claimed noncash charitable contribution made in 2004. Respondent further conceded that petitioners are entitled to a $250 charitable contribution deduction in each of the years 2004 and 2005 for hosting an exchange student for 5 months in 2004 and 2005 pursuant to sec. 170(g)(2).

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), and all Rule references are to the Tax Court Rules of Practice and Procedure.

On the basis of the analysis herein, we find: (1) Petitioners are not entitled to a deduction for the employee business travel expenses incurred in 2004 or 2005; (2) petitioners are entitled to deductions for some of the other unreimbursed business expenses incurred in 2004 and 2005; (3) petitioners are entitled to deductions for some of the charitable contributions claimed to have been made in 2004 and 2005; and (4) petitioners are entitled to an abandonment loss deduction in 2005.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Minnesota at the time their petition was filed. For 2004 and 2005 petitioners filed joint Federal income tax returns.

## I. Expenses Incurred in Newark and Portland

Mr. Alami worked as an airline mechanic for Northwest Airlines, Inc. (NWA), from 1995 to July 2005. Petitioners claimed deductions on their 2004 and 2005 tax returns related to Mr. Alami's employment with NWA. In both years petitioners claimed deductions for vehicle, travel, meals, and entertainment expenses arising from Mr. Alami's work locations in Newark, New Jersey, and Portland, Oregon.

Mr. Alami was a member of the Aircraft Mechanics Fraternal Association (AMFA) (a union that contracted with NWA), and he was subject to a seniority-based employment displacement system. Mr. Alami was subject to displacement from employment should a member with higher seniority bump him from his position.

NWA began reducing the number of mechanics it employed at the end of March 2003. In May 2003 Mr. Alami lost his position in Minneapolis, Minnesota, when a senior mechanic bumped him. Pursuant to the system, Mr. Alami had 5 days to decide between the options of being laid off or exercising his seniority to displace a junior employee. Mr. Alami wanted to stay in Minneapolis but was unable to use his seniority to get a position in Minneapolis. Instead, he used his seniority to get a position in Newark, New Jersey.

A. Newark

Mr. Alami worked in Newark, New Jersey, from May 2003 to July 2004. At the time Mr. Alami took the position in Newark, he did not know how long he would remain there. In a written statement, the AMFA said the duration of Mr. Alami's employment in Newark was "foreseeably limited" and "temporary". In a written statement, NWA stated the position he took in Newark was "temporary".

Mr. Alami rented a room in Newark, and his family stayed in Minnesota while he worked in Newark. Mr. Alami flew home to

Minneapolis from Newark almost every weekend to see his family. Petitioners claimed deductions for vehicle, travel, meals, and entertainment expenses on Form 2106-EZ, Unreimbursed Employee Business Expenses, in 2004. Mr. Alami incurred these expenses while working in Newark. The following is a table of the Newark expenses:

| Item | Amount |
|------|--------|
| Vehicle (6,410 miles @ $.375) | $2,404 |
| Travel expenses (while away from home) | 3,200 |
| Meals and entertainment | 2,964 |
| Total | $8,568 |

B. Minneapolis

In July 2004 Mr. Alami was recalled to Minneapolis to work as a lead mechanic from July 2004 to June 2005. In a written statement, NWA stated the position he took in Minneapolis was "temporary".

In June 2005 he was bumped again. As before Mr. Alami had 5 days to decide between the options of being laid off or exercising his seniority to displace a junior employee. Mr. Alami wanted to stay in Minneapolis but was unable to use his seniority to get a position. Instead, he used his seniority to get a position in Portland, Oregon.

C. Portland

Mr. Alami worked in Portland, Oregon, from June to July 2005. At the time he took the position in Portland, he did not know how long he would remain there. In a written statement, the

AMFA said the duration of Mr. Alami's employment in Portland was "foreseeably limited" and "temporary".

Petitioners claimed deductions for vehicle, travel, meals, and entertainment expenses on Form 2106-EZ in 2005. These were expenses Mr. Alami incurred while working in Portland. The following is a table of the Portland expenses:

| Item | Amount |
|---|---|
| Vehicle (5,135 miles @ $.405) | $2,080 |
| Travel expenses (while away from home) | 1,400 |
| Meals and entertainment | 716 |
| Total | $4,196 |

In July 2005 Mr. Alami's position with NWA was eliminated, he was unable to use his seniority to get another position with NWA, and his employment with NWA ended.

## II. Other Unreimbursed Employee Business Expenses Claimed

In 2004 and 2005 petitioners claimed deductions for other unreimbursed employee business expenses they had incurred.

### A. Mr. Alami's NWA Employment Expenses

Mr. Alami was employed by NWA during all of 2004 and in 2005 until July. Petitioners claimed employee business expense deductions for paying union dues, purchasing a computer, Internet service, cell phone service, tools, maintaining Mr. Alami's uniforms, and depreciation.

In both 2004 and 2005 petitioners claimed a deduction for Mr. Alami's union dues. In 2004 petitioners claimed a $1,404 deduction for union dues, and respondent conceded that

petitioners were entitled to a $761 deduction for union dues. In 2005 petitioners claimed a $1,044 deduction for union dues, and respondent conceded that petitioners were entitled to a $938 deduction for union dues. Petitioners submitted the "dues" portion of Mr. Alami's union contract and a "Dues Rate Increase - Effective May 12, 2001" in support of such expenses.

In 2004 petitioners claimed a deduction for purchasing a computer for Mr. Alami to use in his Newark apartment in the course of his employment with NWA. NWA required employees to check for flights and to submit their expenses online but did not require employees to own a computer. Petitioners also incurred the expense of providing Internet service for the computer.

In both 2004 and 2005 petitioners claimed a deduction for cell phone use by Mr. Alami. Among the reasons Mr. Alami needed the cell phone was that it enabled him to be reached by NWA. Specifically, in Newark Mr. Alami needed the cell phone because he did not have a phone in the room he rented. Mr. Alami was not required by NWA to have a cell phone.

In 2005 petitioners claimed a deduction for purchasing tools to use in the course of Mr. Alami's employment with NWA.

In 2005 petitioners claimed a deduction for cleaning Mr. Alami's work uniforms. Mr. Alami was issued a uniform by NWA to wear in the course of his employment. Mr. Alami was responsible for cleaning his uniform. Mr. Alami provided a uniform

maintenance schedule for 2005 that claimed he washed his work shirts 10 times a month and his work pants 4 times a month for the 12 months of 2005. Each load had a unit cost of $1.50.

Petitioners claimed a deduction in 2004 for depreciation in the total amount of $685 for equipment in the amount of $156 and a computer in the amount of $529. Petitioners presented no evidence of the use of such depreciated items.

Petitioners claimed a deduction of $176 in 2005 for depreciation of a computer. Petitioners presented no evidence of the use of the computer.

B. Mr. Alami's Soccer Coach Employment Expenses

Mr. Alami became employed as a soccer coach in the school district of Lakeville, Minnesota, during 2005 and earned $2,398. Petitioners claimed a deduction of $550 for unreimbursed soccer coaching expenses Mr. Alami incurred in 2005.

Petitioners did not produce receipts for expenses incurred but did submit a photo showing the items Mr. Alami bought. Petitioners did not produce any evidence that such purchases were required by Mr. Alami's employer.

C. Ms. Alami's Nurse Employment Expenses

Ms. Alami worked as a registered nurse during 2004 and 2005 in the pediatric intensive care unit of Children's Hospital in Minneapolis. Ms. Alami was responsible for purchasing her uniforms, and she was not reimbursed by her employer for such

purchases. She was required to purchase and wear royal/marine blue scrubs to work. Ms. Alami was also responsible for cleaning her own uniforms.

Ms. Alami was periodically required by her employer to be on call. While on call, Ms. Alami had to arrive at the hospital within a certain window of time. Ms. Alami's employer did not require her to own a cell phone; but among the reasons she purchased a cell phone was that she would not have to wait by her home phone while on call.

In 2004 petitioners claimed a $2,048 deduction for Ms. Alami's unreimbursed employee business expenses. These claimed expenses consisted of $360 in cell phone expenses, $500 in job-related education expenses, $255 in financial publication expenses, $88 in license expenses, $325 in uniform expenses, and $520 in uniform maintenance expenses. Respondent conceded the license expenses and uniform maintenance expenses after the expenses were combined with Mr. Alami's uniform maintenance expenses for 2004.

In 2005 petitioners claimed a $775 deduction for Ms. Alami's unreimbursed employee business expenses. These claimed expenses consisted of $255 in publications expenses and $520 in uniform maintenance expenses. Respondent conceded $260 of the uniform maintenance expenses.

III.  Charitable Contribution Deductions

Petitioners claimed a charitable contribution deduction of $2,735 in 2004.  Petitioners claim to have contributed $1,885 in cash and $850 in noncash.  Petitioners claim to have made other than cash contributions of clothing and miscellaneous household goods with a value of $500 to the Goodwill Industries in Apple Valley, Minnesota, and clothing and miscellaneous household goods with a value of $350 to the Veterans Association in Minneapolis, Minnesota.  Petitioners said they used the "thrift shop value" method to determine the value of the contributions.  Respondent conceded $500 of the noncash charitable contributions petitioners claimed.

Petitioners claimed a charitable contribution deduction of $1,890 in 2005.  Petitioners claim to have contributed $1,000 in cash and $890 other than cash.  Petitioners claim to have made noncash contributions of clothing and miscellaneous household goods with a value of $890 to the Veterans Association in Minneapolis, Minnesota.  Again, petitioners used the "thrift shop value" method to arrive at the amount of the contribution.

Petitioners produced a copy of a $100 check donation to the Islamic Relief Fund in 2004.  They also produced the following: (1) An undated receipt for a bag of clothing and miscellaneous items donated to the Vietnam Veterans of America, (2) a receipt for a bag of clothing and miscellaneous items donated to the

Lupus Foundation in September 2004, (3) a blank donation receipt from the Veteran's Thrift Store with a "10-01" date, (4) a handwritten list of what was included in 2004 for noncash donations with an estimate of each item's value, (5) a handwritten list of what was included in 2005 for noncash donations with an estimate of each item's value, and (6) a 2002 value guide for used clothing and other items commonly donated to charity.

IV.  Quiznos Franchise

Petitioners paid a $25,000 nonrefundable franchise fee to Quiznos Franchising, L.L.C. (Quiznos), on October 27, 2003, with the intent of opening up a Quiznos restaurant.  The Quiznos franchise agreement stated that petitioners would execute a lease for a location within 1 year from the date the agreement was signed.  It also allowed the franchisor (Quiznos) to extend this period by 3 months when events outside of the franchisees' (petitioners') control occurred in selecting a location.  In January 2004 petitioners paid $750 to form the limited liability corporation Casa Star, Inc., to run their Quiznos restaurant.

Pursuant to petitioners' franchise agreement, petitioners were to begin looking for potential store locations but were not permitted to have any direct contact with owners or real estate agents in arranging the store location.  Quiznos was to handle the leasing arrangements.

Petitioners began looking for a location for their Quiznos restaurant immediately after paying their franchise fee. The location of petitioners' Quiznos restaurant was supposed to be in Lakeville, Minnesota (a suburb of Minneapolis where petitioners resided). After two Quiznos restaurants had opened in Lakeville, petitioners expanded their search for a location in the entire Twin Cities area because petitioners did not think there was a sufficient business base to support a third (their) Quiznos restaurant in Lakeville, Minnesota.

Petitioners began working with a representative of Quiznos (Quiznos representative) to find and make arrangements for a location for their store in October 2003 and continued their efforts through 2004. Petitioners would call the Quiznos representative to try and get a location for their Quiznos restaurant, and weeks, sometimes months, would go by without a response. Petitioners would also e-mail the Quiznos representative and would not receive a response.

In 2005 petitioners discovered many Quiznos restaurants were bankrupt or were close to filing for bankruptcy. Petitioners also discovered a class action lawsuit had been filed against Quiznos by some Quiznos restaurant owners. The lawsuit's allegations focused on Quiznos's "conduct in selling franchises throughout the United States and its post-contractual efforts to bilk its franchisees through a scheme to overcharge for the

essential goods, supplies, services and equipment necessary to run a Quiznos franchise."

When Quiznos did respond to petitioners' inquiries, Quiznos encouraged petitioners to buy an existing restaurant that was for sale by the owner. Petitioners had already learned that similar existing locations were not turning a profit, failing, and close to bankruptcy. Petitioners had spoken with other Quiznos owners and discovered the other franchise owners had put $250,000 into their store, in addition to the franchise fee of $25,000, only to have it go bankrupt.

Petitioners believed that Quiznos's structure prevented the restaurants from being profitable because Quiznos required store owners to purchase everything through specific suppliers. As of December 5, 2005, petitioners no longer wanted to open a Quiznos restaurant because they thought it was not worth the additional $250,000 investment necessary to actually open the restaurant.

Petitioners contacted the Quiznos representative in 2005 to ask that their $25,000 franchise fee be refunded. The Quiznos representative refused to refund petitioners' money. Petitioners asked for Quiznos's refusal to refund the franchise fee to be put in writing, but the Quiznos representative would not provide the refusal in writing and told petitioners to contact Quiznos's corporate office. Petitioners contacted Quiznos's corporate office and did not receive a response.

When petitioners did not receive a response to their request for a refund of the franchise fee, petitioners contacted the attorney general of Minnesota (attorney general). Petitioners did not hire an attorney because they could not afford one. Petitioners did not attempt to join in the class action lawsuit because the participants were Quiznos restaurant owners who had already opened a store, and there was a fee for joining the lawsuit.

The attorney general wrote a letter to Quiznos on October 4, 2005, requesting a written response to petitioners' request for a refund in 10 days. Quiznos did not timely respond, and the attorney general wrote another letter to Quiznos requesting a response. Quiznos responded on October 31, 2005, but did not address whether petitioners would be refunded their money. Petitioners contacted the attorney general after receiving a copy of Quiznos's response, and petitioners' letter was forwarded to Quiznos by the attorney general on November 14, 2005. In a letter dated December 2, 2005, Quiznos refused to refund petitioners' franchise fee of $25,000. The attorney general forwarded this letter to petitioners on December 5, 2005. Petitioners have taken no further action to try to procure a refund of the franchise fee.

Petitioners claimed a $25,750 abandonment loss deduction on their 2005 tax return for the $25,000 Quiznos franchise fee and

for the $750 they paid to incorporate Casa Star, Inc.

Petitioners also claimed a $1,667 depreciation deduction for

their Quiznos franchise.  Petitioners did not take any actions to

formally dissolve Casa Star, Inc.  Petitioners were unaware that

any action had to be taken to dissolve Casa Star, Inc., and do

not know whether or not Casa Star, Inc., remains active today.

OPINION

Petitioners have not claimed that they satisfied the

requirements of section 7491(a) to shift the burden of proof to

respondent with regard to any factual issue.  Accordingly,

petitioners bear the burden of proof.  See Rule 142(a).

Deductions are a matter of legislative grace, and the

taxpayer has the burden of showing that he is entitled to any

deduction claimed.  Id.; New Colonial Ice Co. v. Helvering, 292

U.S. 435, 440 (1934).

I.  Traveling Expenses Incurred in Newark and Portland

A taxpayer's expenses for his own food and lodging are

"personal, living, and family expenses" within the meaning of

section 262(a) and therefore nondeductible unless a deduction is

expressly permitted by some other section.  See sec. 1.262-

1(b)(3), (5), Income Tax Regs.  Section 162(a) permits a taxpayer

to deduct ordinary and necessary traveling expenses (including

meals and lodging) incurred during the taxable year in carrying

on any trade or business if:  (1) The expense is incurred "while

away from home", and (2) the expense is incurred in the pursuit of a trade or business.  See also Commissioner v. Flowers, 326 U.S. 465, 470 (1946).

In order to determine whether an expense is incurred away from home, it is necessary to determine the location of the taxpayer's home.  Hantzis v. Commissioner, 638 F.2d 248 (1st Cir. 1981), revg. T.C. Memo. 1979-299.  In the context of section 162(a)(2), a taxpayer's home generally refers to the area of a taxpayer's principal place of employment, whether or not in the vicinity of the taxpayer's personal residence.  Daly v. Commissioner, 72 T.C. 190, 195 (1979), affd. 662 F.2d 253 (4th Cir. 1981); Kroll v. Commissioner, 49 T.C. 557, 561-562 (1968). Accordingly, when a taxpayer's principal place of employment changes but the taxpayer does not change the location of his permanent personal residence, the taxpayer's home for purposes of section 162 generally changes to the taxpayer's new principal place of business.

An exception to the general rule in defining a taxpayer's home may exist where the taxpayer has accepted "temporary" employment away from his permanent personal residence.  Peurifoy v. Commissioner, 358 U.S. 59, 60 (1958).  In that event the taxpayer's tax home may remain in the area of his permanent personal residence so that he is "away from home" while stationed at the temporary job site.  If such employment is found to be

"indefinite" or "indeterminate" rather than temporary, the general rule will classify a taxpayer's tax home as the area of the taxpayer's principal place of employment. <u>Kroll v. Commissioner</u>, <u>supra</u> at 562. Whether employment is temporary, indefinite, or indeterminate is a question of fact. <u>Peurifoy v. Commissioner</u>, <u>supra</u> at 61. However, section 162(a) provides that a taxpayer shall not be treated as being temporarily away from home during any period of employment if such period exceeds 1 year.

"[I]n the pursuit of a trade or business" has been read to mean: "The exigencies of business rather than the personal conveniences and necessities of the traveler must be the motivating factors." <u>Commissioner v. Flowers</u>, 326 U.S. at 474.

This Court previously has dealt with the question of whether bumped NWA airline mechanics are entitled to deduct vehicle/lodging/meal expenses incurred while working away from their primary residences. See <u>Riley v. Commissioner</u>, T.C. Memo. 2007-153; <u>Wilbert v. Commissioner</u>, T.C. Memo. 2007-152, affd. 553 F.3d 544 (7th Cir. 2009); <u>Farran v. Commissioner</u>, T.C. Memo. 2007-151; <u>Bogue v. Commissioner</u>, T.C. Memo. 2007-150; <u>Stockwell v. Commissioner</u>, T.C. Memo. 2007-149. In all five aforementioned NWA cases, we disallowed deductions claimed by taxpayers because in each case there were no business exigencies for the taxpayers to maintain their primary residence in the Minneapolis area away

from their place of employment.  Accordingly, the taxpayers had not maintained their residences  in the pursuit of business.  See Riley v. Commissioner, supra; Wilbert v. Commissioner, supra; Farran v. Commissioner, supra; Bogue v. Commissioner, supra; Stockwell v. Commissioner, supra.  This conclusion was recently affirmed by the Court of Appeals for the Seventh Circuit in Wilbert v. Commissioner, 553 F.3d 544 (7th Cir. 2009).

A.  Newark

Mr. Alami's employment in Newark lasted approximately 14 months (May 2003 through July 2004).  Section 162(a) provides that a taxpayer shall not be treated as being temporarily away from home during any period of employment if such period exceeds 1 year.  Because Mr. Alami was not temporarily away from home when he was working in Newark, his tax home shifted to Newark.  See Peurifoy v. Commissioner, supra at 60-61.  Accordingly, Mr. Alami was not away from home when he incurred the Newark expenses and petitioners may not deduct the Newark expenses as section 162(a)(2) traveling expenses.

B.  Portland

After Mr. Alami was bumped from Newark, New Jersey, he became employed with NWA in Minneapolis and worked there from July 2004 until June 2005.  In June 2005 when Mr. Alami was bumped again from his position in Minneapolis, he was able to secure a position in Portland.  He worked in Portland from June

to July 2005, when he lost his job with NWA. During 2005 Mr. Alami also worked in the Minneapolis area as a soccer coach for the Independent School District of Lakeville, Minnesota.

Whether his position in Portland was temporary is a question of fact. Mr. Alami's position in Portland lasted less than 2 months. However, we need not decide whether Mr. Alami's employment in Portland was temporary because he did not maintain his Minneapolis residence in the pursuit of business.

In order for Mr. Alami's Portland expenses to be deductible, he must have maintained his Minneapolis area residence in the pursuit of a trade or business. In Wilbert, Stockwell, Boque, Farran, and Riley, we concluded that none of the taxpayers had maintained their Minneapolis area homes in the pursuit of business. In all five cases, after the taxpayers had been bumped from Minneapolis to places of employment outside of Minneapolis, we noted that the taxpayers' chances of becoming employed by NWA in Minneapolis (again) depended on NWA's needs. We concluded it was unforeseeable that any of the taxpayers would be able to return to employment in Minneapolis at any time because of the seniority system. Accordingly, we concluded that the taxpayers maintained homes in the Minneapolis area for personal reasons. This reasoning recently was affirmed by the Court of Appeals for the Seventh Circuit in Wilbert v. Commissioner, 553 F.3d at ___ (slip op. at 10), when the court stated: "We might well have a

different case if Wilbert had had a firm, justified expectation of being restored to his job at the Minneapolis airport within a short time of his initial layoff."

The circumstances in this case are most analogous to those in Wilbert.  The taxpayer in Wilbert had a real estate business[2] in addition to his employment with NWA, and the taxpayer's wife was employed intermittently in the Minneapolis area.  We concluded that because the taxpayer's principal employment was with NWA and not his real estate business, the latter was not a significant factor in our analysis.  Wilbert v. Commissioner, T.C. Memo. 2007-152 n.5.  This reasoning was affirmed by the Court of Appeals, which noted that if selling real estate had been Mr. Wilbert's main business, it would have provided Mr. Wilbert a good argument that he had a business reason to maintain his Minneapolis area residence (Mr. Wilbert's real estate business was based in the Minneapolis area).  Wilbert v. Commissioner, 553 F.3d at ___ (slip op. at 10-11).  Here, in circumstances similar to those in Wilbert, it does not appear that Mr. Alami's soccer coaching job was his main business in 2005.  There is no evidence that Mr. Alami considered his soccer coaching employment his main employment when he accepted employment in Portland.  Rather, Mr. Alami worked for NWA and

---

[2]  Mr. Wilbert's income from the real estate business was $2,000 in the relevant tax year but he did not actually receive the money (a commission) until the following year.

accepted employment outside the Minneapolis area in order to stay employed with NWA as long as possible. Accordingly, the soccer coaching job did not provide Mr. Alami with a business reason to maintain his Minneapolis area residence during the period of his employment with NWA.

The Court of Appeals considered whether Mrs. Wilbert's having a business in Minneapolis would provide a business reason for Mr. Wilbert to maintain the Minneapolis area residence. Wilbert v. Commissioner, 553 F.3d at ___ (slip op. at 12). The court noted that her employment would make it more reasonable for Mr. Wilbert to not move away from Minneapolis but would not permit a deduction of traveling expenses. Id. Mr. Wilbert's decision to live with his wife would be a personal rather than business decision. Id. ("'in this respect, Mr. and Mrs. Hantzis' situation is analogous to cases involving spouses with careers in different locations. Each must independently satisfy the requirement that deductions taken for travel expenses incurred in the pursuit of a trade or business arise while he or she is away from home'" (quoting Hantzis v. Commissioner, 638 F.2d at 254 n.11)). Here, although Ms. Alami was employed in Minneapolis, this does not provide a business reason for Mr. Alami's maintenance of the Minneapolis area residence.

Similar to the taxpayers in Wilbert, Stockwell, Bogue, Farran, and Riley, Mr. Alami did not appear at any point to have

a realistic prospect of resuming working for NWA in Minneapolis after he was bumped from his Minneapolis employment for the second time in June 2005. Accordingly, Mr. Alami did not have a business reason to maintain his Minneapolis area residence, and he is not entitled to deduct the Portland expenses.

II. Other Unreimbursed Business Expenses Claimed

The Commissioner's determinations are generally presumed correct, and the taxpayer bears the burden of proving the determinations erroneous. Rule 142(a). The taxpayer bears the burden of proving that he is entitled to the deduction claimed, and this includes the burden of substantiation. Id.; Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). A taxpayer must substantiate amounts claimed as deductions by maintaining the records necessary to establish he or she is entitled to the deductions. Sec. 6001.

A taxpayer may deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business during the year. Sec. 162(a). Personal, living, or family expenses are not deductible. Sec. 262. Services performed by an employee constitute a trade or business, and, accordingly, a taxpayer may deduct unreimbursed employee business expenses incurred. O'Malley v. Commissioner, 91 T.C. 352, 363-364 (1988); sec. 1.162-17(a), Income Tax Regs.

If a taxpayer establishes that he or she paid or incurred a deductible business expense but does not establish the amount of the expense, we may approximate the amount of the allowable deduction, bearing heavily against the taxpayer whose inexactitude is of his or her own making. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). However, for the Cohan rule to apply, there must be sufficient evidence in the record to provide a basis for the estimate. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). Certain expenses may not be estimated because of the strict substantiation requirements of section 274(d). See sec. 280F(d)(4)(A); Sanford v. Commissioner, 50 T.C. 823, 827 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969).

A.   Mr. Alami's Other NWA Employee Expenses

The expenses petitioners claim as employee business expense deductions in 2004 which are still in dispute are as follows: Union dues expenses, a computer expense, cell phone and Internet expenses, and a depreciation expense.

The expenses petitioners claim as employee business expense deductions in 2005 which are still in dispute are as follows: Union dues expenses, cell phone expenses, tool expenses, uniform maintenance expenses, and a depreciation expense.

1.   Union Dues

The amounts of union dues expenses still in dispute for 2004 and 2005 are $643 and $106, respectively.

Petitioners have failed to present any evidence that they actually paid such union dues. Petitioners have submitted evidence as to the amounts of dues required in 2004 and 2005; however, they have failed to substantiate that they actually paid them. Accordingly, petitioners are not entitled to employee business expense deductions for union dues in 2004 and 2005 above those respondent conceded.

### 2. Computer

A computer is "listed property" and subject to the strict substantiation requirements of section 274(d). Sec. 280F(d)(4)(A)(iv). Petitioners introduced a Gateway receipt dated September 2, 2003, as substantiation for the computer expense.

Mr. Alami claimed to have used the computer to check on job-related information. However, he was not able to produce any evidence that he was required by his employer NWA to have a computer, nor did he prove how much of the computer's overall use was for business (as distinct from personal) purposes. Mr. Alami's purchase of the computer was not shown to be an ordinary and necessary business expense of being an employee of NWA. See Riley v. Commissioner, T.C. Memo. 2007-153; Wasik v. Commissioner, T.C. Memo. 2007-148.

However, even if petitioners had shown the computer to be an ordinary and necessary business expense of being an employee of

NWA, petitioners have not substantiated the purchase of the computer. Petitioners submitted a receipt dated 2003 in support of a deduction claimed for 2004. Petitioners have not shown that they incurred such an expense in 2004. Petitioners' deduction for a computer expense is disallowed.

### 3. Cellular Phone

A cellular phone is "listed property" and subject to the strict substantiation requirements of section 274(d). Sec. 280F(d)(4)(A)(v). A taxpayer must establish the amount of business use and the amount of total use for the property to substantiate the amount of expenses for listed property. Nitschke v. Commissioner, T.C. Memo. 2000-230; sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). Petitioners introduced cellular phone bills and checks used to pay these cellular phone bills that partially substantiate the amounts of the claimed deductions.

Mr. Alami claimed the cellular phone was a necessity in Newark and Portland where he did not have a land phone line. Mr. Alami also stated that the amounts of the claimed deductions were a quarter of the total of his phone bills for 2004 and 2005.

Mr. Alami has failed to establish the amount of time he used his cell phone for business and personal purposes. Additionally, Mr. Alami conceded that his employer did not require that he have a cell phone. See Riley v. Commissioner, supra; Stockwell v.

Commissioner, T.C. Memo. 2007-149; Wasik v. Commissioner, supra.
Petitioners' deductions for cellular phone expenses are
disallowed.

### 4. Internet

Internet expenses have been characterized as utility
expenses. See Verma v. Commissioner, T.C. Memo. 2001-132.
Strict substantiation therefore does not apply, and we may
estimate the business portion of utility expenses under the Cohan
rule. See Pistoresi v. Commissioner, T.C. Memo. 1999-39.

Petitioners introduced checks with Charter Communications as
payee which exceed the claimed amounts of Internet deductions,
but petitioners did not introduce evidence as to how much Mr.
Alami used the Internet for NWA employee matters and personal
matters. Additionally, petitioners did not produce evidence that
NWA required Mr. Alami to have Internet access. The Internet
expenses petitioners incurred were not ordinary and necessary
employee business expenses. See Riley v. Commissioner, supra;
Stockwell v. Commissioner, supra. Petitioners' deductions for
Internet expenses are disallowed.

### 5. Tools

The amount of the tool expenses deduction still in dispute
for 2005 is $1,100. Petitioners submitted the following four
receipts to substantiate the tool expenses: Sears, $179.91 on
07/13/05; Home Depot, $112.37 on 10/26/05 (but petitioners

claimed only $99.97 of that amount as a deductible employee business expense); Fleet Farm, $41.48 with an unknown date, and Home Depot, with an unknown amount and date.

The strict substantiation requirements of section 274(d) do not apply to these expenses, and the Cohan rule may apply; however, petitioners must still provide minimum substantiation of such expenses because petitioners bear the burden of proof. See sec. 6001; Rule 142(a). We allow petitioners a $279.88 deduction for tools (Sears receipt, $179.91 plus Home Depot receipt, $99.97). Petitioners were not able to provide the dates of the Fleet Farm receipt or the Home Depot receipt, nor were they able to provide further information about the other tool purchases during 2005.

### 6. Uniform Maintenance

The amount of uniform maintenance expense deductions still in dispute for 2005 is $140. Expenses for uniforms are deductible if the uniforms are of a type specifically required as a condition of employment, the uniforms are not adaptable to general use as ordinary clothing, and the uniforms are not worn as ordinary clothing. Yeomans v. Commissioner, 30 T.C. 757, 767-769 (1958); Wasik v. Commissioner, supra; Beckey v. Commissioner, T.C. Memo. 1994-514. Mr. Alami was required to wear a uniform provided by NWA to work every day.

Petitioners introduced a document on the letterhead of their C.P.A. that purports to indicate how the sum was calculated, but it suggests an excessive amount.  The document alleges that Mr. Alami washed his uniform 14 times per month at $1.50 per wash and dry cycle for 12 months in 2005.

We may estimate the amount of these expenses using the Cohan rule.  See Riley v. Commissioner, supra; Stockwell v. Commissioner, supra.  We adopt the unit cost of $1.50 listed on petitioners' exhibit as the cost to wash and dry one load of laundry.  We find that approximately eight loads of laundry for each of the months Mr. Alami worked is a reasonable number to yield 22 clean shirts, pants, and a jacket per month.  Mr. Alami worked only 7 months for NWA in 2005.  This yields a deduction for uniform maintenance that does not exceed the amount respondent conceded.[3]  Accordingly, petitioners are not entitled to deduct any uniform maintenance expenses above that respondent conceded.

7.  Depreciation

Petitioners claimed a computer depreciation expense of $529 for 2004, an equipment depreciation expense of $156 for 2004, and a computer depreciation expense of $176 for 2005.

---

[3]  $1.50 x eight loads per month equals $12 per month x 7 months equals $84.

A deduction is allowed for depreciation of property used in a trade or business or held for the production of income. Sec. 167(a). Petitioners have failed to show that the computer or the equipment being depreciated was used in a trade or business or held for the production of income. Accordingly, petitioners' depreciation deductions are disallowed.

B. <u>Mr. Alami's Soccer Coach Employment Expenses</u>

The amount of soccer coaching expenses still in dispute is $355. Petitioners did not produce any receipts but did produce a photo of the items Mr. Alami purchased and a catalog of prices. The photo showed 18 soccer balls, three soccer ball bags, a ball pump, and other items which were unclear. Mr. Alami testified he purchased these items for his job as a soccer coach.

Mr. Alami failed to present sufficient evidence that he actually incurred the expenses of purchasing these items. Accordingly, these expenses are not deductible.

C. <u>Ms. Alami's Nurse Employee Expenses</u>

The amount of Ms. Alami's employee business expenses still in dispute for 2004 is $1,440. Petitioners claim this amount resulted from cell phone expenses, job-related education expenses, financial publication expenses, and uniform expenses. Petitioners substantiated $360 of cell phone expenses and provided a catalog listing scrub prices (required work attire).

The amount of Ms. Alami's employee business expenses still in dispute for 2005 is $515.  Petitioners claim this amount resulted from $255 in publication expenses and $260 in unconceded uniform maintenance expenses.  Petitioners substantiated $260 of uniform maintenance expenses.

A cellular phone is "listed property" for purposes of section 274(d)(4) and subject to the strict substantiation requirements of section 274(d).  Sec. 280F(d)(4)(A)(v).  A taxpayer must establish the amount of business use and the amount of total use for the property to substantiate the amount of expenses for listed property.  Nitschke v. Commissioner, T.C. Memo. 2000-230; sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., supra.

Petitioners provided copies of their cellular phone bills but failed to establish that they incurred any expense to use Ms. Alami's cellular phone for employee business purposes in addition to those expenses they would have incurred if she had used it only for personal purposes.  Ms. Alami was not required by her employer to have a cellular phone.  Accordingly, petitioners' deduction for Ms. Alami's cellular phone is disallowed. See Riley v. Commissioner, T.C. Memo. 2007-153; Stockwell v. Commissioner, T.C. Memo. 2007-149; Wasik v. Commissioner, T.C. Memo. 2007-148.

Petitioners have failed to provide adequate substantiation of the remaining expenses Ms. Alami claimed as business expense deductions in 2004 and 2005. Accordingly, the remaining employee business expense deductions are disallowed.

III. Charitable Contribution Deductions

Petitioners claim deductions for cash and noncash charitable contributions made in 2004 and 2005. The amounts of charitable contribution deductions still in dispute for 2004 and 2005 are $1,985 and $1,640, respectively.

A. 2004

The amounts of cash and noncash charitable contributions still in dispute for 2004 are $1,635 and $350, respectively.

Substantiation of the disputed amounts is sparse at best. Petitioners have produced a copy of a check written on December 31, 2004, to the Islamic Relief Fund in the amount of $100. Petitioners have also produced receipts from the Vietnam Veterans of America and the Lupus Foundation. Neither receipt contains the amount of the donation. The Lupus Foundation receipt is dated "09/04" and the Vietnam Veterans of America receipt is not dated. Petitioners submitted an undated handwritten list of items that were donated to both organizations in 2004.

In general, a taxpayer is entitled to deduct charitable contributions made during the taxable year to or for the use of

certain types of organizations. Sec. 170(a)(1), (c). A taxpayer is required to substantiate charitable contributions; records must be maintained. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

A contribution of money in an amount less than $250 made in a tax year beginning before August 17, 2006, may be substantiated with a canceled check, a receipt, or other reliable evidence showing the name of the donee, the date of the contribution, and the amount of the contribution. Sec. 1.170A-13(a)(1), Income Tax Regs. The copy of the check to the Islamic Relief Fund submitted by petitioners contains the name of the donee, the date, and the amount of the contribution. Respondent has not disputed the status of this organization as a qualified charitable donee. Accordingly, petitioners have substantiated a $100 cash charitable contribution and are entitled to a charitable contribution deduction in that amount.

Contributions of cash or property in excess of $250 require the donor to obtain contemporaneous written acknowledgment of the donation from the donee. Sec. 170(f)(8). At a minimum, the contemporaneous written acknowledgment must contain a description of any property contributed, a statement as to whether any goods or services were provided in consideration, and a description and good faith estimate of the value of any goods or services referred to. Sec. 170(f)(8)(B).

Petitioners claim to have made noncash charitable contributions of clothing and miscellaneous items worth $500 and $350 to Goodwill Industries and the Veterans Association, respectively. The receipts petitioners submitted to substantiate the noncash charitable contributions do not meet the statutory requirements. Petitioners have submitted a Lupus Foundation receipt as substantiation although they do not claim to have made a charitable contribution to the Lupus Foundation. Petitioners have not submitted a contemporaneous written acknowledgment from Goodwill Industries to substantiate a charitable contribution. Petitioners submitted a receipt from the Vietnam Veterans of America, but it is does not meet the statutory requirements of a contemporaneous written acknowledgment because it does not contain a description of the property contributed. Moreover, the receipt is undated and cannot be shown to be contemporaneous. Accordingly, petitioners are not entitled to a deduction for noncash charitable contributions claimed in 2004 above that conceded by respondent.

B. 2005

The amounts of cash and noncash charitable contributions still in dispute for 2005 are $750 and $890, respectively.

Substantiation of petitioners' claimed charitable contributions is also sparse for 2005. Petitioners have failed to produce any evidence of the cash charitable contributions.

For the reasons stated <u>supra</u>, without substantiation we must disallow petitioners' deduction for cash charitable contributions above that conceded by respondent.

Petitioners claim to have made noncash charitable contributions of clothing and miscellaneous items worth $890 to the Veterans Association. Petitioners submitted a receipt from the Veteran's Thrift Store as substantiation for the noncash charitable contribution and a handwritten list of items contributed. The receipt did not contain an estimated amount donated or a description of the items donated. Further, it listed "10-01" as the date acknowledged. As stated <u>supra</u>, a noncash contribution in an amount over $250 requires contemporaneous written acknowledgment to substantiate the contribution. At a minimum, this acknowledgment must contain a description of the property donated. The receipt submitted from the Veteran's Thrift Store does not contain such a description. Additionally, the date listed as "10-01" is unclear; it could either mean October 1 (year unknown) or October 2001. Without a clear date, we are unable to determine whether petitioners made the charitable contribution in 2005 or another tax year or whether petitioners received the contemporaneous acknowledgment required. Accordingly, petitioners are not entitled to a deduction for noncash charitable contributions in 2005.

IV.  Quiznos Franchise

Petitioners claim a $25,750 abandonment loss for their Quiznos restaurant franchise.  This includes the amount petitioners paid to incorporate Casa Star, Inc., for the purpose of running petitioners' Quiznos restaurant.

Section 165(a) allows a deduction for any uncompensated loss sustained during the taxable year.  The loss must be incurred in a trade or business, in any transaction entered into for profit, or in a casualty or theft.  Sec. 165(c).  The amount of the loss is the adjusted basis of the property.  Sec. 165(b).  The loss is allowed for the year in which the act of abandonment takes place.  See Buda v. Commissioner, T.C. Memo. 1999-132, affd. without published opinion 230 F.3d 1357 (6th Cir. 2000); sec. 1.165-1(d)(1), Income Tax Regs.

In order for the loss of an intangible asset to be deductible, there must be (1) an intention on the part of the owner to abandon the asset and (2) an affirmative act of abandonment.  JHK Enters. Inc. v. Commissioner, T.C. Memo. 2003-79 (quoting A.J. Indus., Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974)).  An affirmative act of abandonment must be ascertained from all the facts and circumstances, United Cal. Bank v. Commissioner, 41 T.C. 437, 451 (1963), affd. per curiam 340 F.2d 320 (9th Cir. 1965), and "the Tax Court [is] entitled to look beyond the taxpayer's formal characterization", Laport v.

Commissioner, 671 F.2d 1028, 1032 (7th Cir. 1982), affg. T.C. Memo. 1980-355. Abandonment of an intangible property interest should be accomplished by some express manifestation. Citron v. Commissioner, 97 T.C. 200, 210 (1991).

Losses claimed with respect to nondepreciable property must also meet the requirements of section 1.165-2(a), Income Tax Regs., which provides in part:

> A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. * * *

JHK Enters. Inc. v. Commissioner, T.C. Memo. 2003-79.

Conveyance or even tender of title is not necessary to consummate an abandonment. Echols v. Commissioner, 935 F.2d 703, 706 (5th Cir. 1991), revg. 93 T.C. 553 (1989). When the taxpayer has not relinquished possession of an asset, there must be a concurrence of the act of abandonment and the intent to abandon, both of which must be shown from the surrounding circumstances. A.J. Indus., Inc. v. United States, 503 F.2d at 670.

Petitioners claim an abandonment loss deduction of $25,750. Of this amount, $25,000 is the initial amount paid for the Quiznos franchise and $750 is the amount paid for incorporating Casa Star, Inc., the limited liability corporation petitioners

planned to use to operate their Quiznos restaurant. Respondent argues that petitioners should be denied the total abandonment loss claimed because they took no action to formally dissolve Casa Star, Inc. We disagree.

Petitioners expressed their intent to abandon their Quiznos franchise by the end of 2005. Throughout 2005 petitioners clearly and repeatedly expressed to Quiznos representatives their desire to have their franchise fee refunded because they no longer sought to open a Quiznos restaurant.

When Quiznos representatives failed to even respond to petitioners' repeated requests for a refund, petitioners filed a complaint with the attorney general. After the attorney general was unable to procure a refund of petitioners' franchise fee, petitioners discontinued their attempts to open a Quiznos restaurant and attempts to collect a refund. Accordingly, petitioners intended to abandon their Quiznos franchise.

Petitioners actually abandoned their Quiznos franchise by the end of 2005. Petitioners repeatedly expressed to Quiznos representatives that they were discontinuing their efforts to open a Quiznos restaurant and that they were abandoning their Quiznos franchise. Petitioners did not contribute the additional money needed to open a Quiznos restaurant or select a location within the 1-year limit in the initial franchise agreement (or request an extension of time because of circumstances beyond

their control).  These were clear and unequivocal indications to Quiznos that petitioners were abandoning their franchise.  In consideration of all the facts and circumstances of the situation, particularly that petitioners' communication with Quiznos was primarily unilateral, these were sufficient signs of actual abandonment by petitioners in 2005.

Petitioners abandoned their Quiznos franchise by the end of 2005.  Neither the Code nor the regulations specify the physical methods or legal procedures for abandoning a franchise.  Nevertheless, petitioners' expression of their intent to abandon and actual act of abandonment, both occurring by the end of 2005, are sufficient proof of petitioners' abandonment.  Accordingly, petitioners are entitled to an abandonment loss of the Quiznos franchise on their 2005 income tax return.

At the end of 2005 petitioners also had abandoned Casa Star, Inc.  Although petitioners had not formally dissolved Casa Star, Inc., the surrounding facts and circumstances show petitioners' abandonment.  Casa Star, Inc., existed solely for the purpose of running petitioners' Quiznos restaurant.  When petitioners expressed their intent to abandon their Quiznos franchise, petitioners also expressed their intent to abandon Casa Star, Inc.  Under the facts of this case, petitioners' abandonment of their Quiznos franchise was also an abandonment of Casa Star, Inc., because Casa Star, Inc., ceased to be of use to petitioners

once they abandoned their Quiznos franchise.  There is no evidence that petitioners have taken any steps to use Casa Star, Inc., for purposes other than running their Quiznos franchise; rather, at trial petitioners were not even aware whether Casa Star, Inc., was in existence.  Accordingly, petitioners are entitled to an abandonment loss of Casa Star, Inc., on their 2005 income tax return.

To reflect the foregoing,

Decision will be entered

under Rule 155.